**PARALYZED VETERANS OF AMERICA, et al.,**
Plaintiffs,

v.

**ELLERBE BECKET ARCHITECTS & ENGINEERS, P.C., et al.,**
Defendants.

Civ. No. 96–1354 (TFH).

United States District Court, District of Columbia.

Dec. 20, 1996.

William H. Jeffress, Jr., Niki Kuckes, David S. Cohen, Mathew S. Nosanchuk and Jody A. Manier, Miller, Cassidy, Larrocca & Lewin, Washington, DC, for Plaintiffs.

Brendan V. Sullivan, Jr., John G. Kester, Williams & Connolly, Washington, DC, for Defendants.

### *MEMORANDUM OPINION*

THOMAS F. HOGAN, District Judge.

In his treatise on the young American Republic, *Democracy in America*, Alexis de Tocqueville observed that "there is hardly a political question in the United States which does not sooner or later turn into a judicial

one."[1] The French writer could easily have had in mind the present case, in which plaintiffs have sued to enforce the requirements of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.[2] Congress has assigned to the Attorney General the duty and power to interpret that statute and to set standards for enforcement and compliance. 42 U.S.C. § 12186(b). Unfortunately, while the Department of Justice has issued broad Standards for Accessible Design, it has not seen fit to step up to its statutorily mandated role by providing concrete guidance for architects and builders. Plaintiffs have asked the Court to enforce demanding, and controversial, design requirements that the Department of Justice has never championed in any court or in any rulemaking procedure, and which the Department has declined to support in the present case, despite several invitations from the Court to do so. Therefore, the Court is forced to step in and decide issues which would have been far better left to the politicians in the Executive and Legislative branches.

This case concerns the design and construction of a new arena, slated to be called the "MCI Center," which is being built in downtown Washington, D.C., by defendants. The arena will be the new home of two professional sports franchises, the Washington Capitals hockey team and the soon-to-be-renamed[3] Washington Bullets basketball team. The arena will also host concerts, college sporting contests, and other entertainment events. Plaintiffs filed this suit on June 14, 1996, claiming that the seating bowl, as designed, fails to provide the number of "accessible" wheelchair locations required by the ADA.

The present litigation has raised a number of difficult issues, particularly since the Justice Department has declined to lend its expertise. The case is all the more difficult because the Court finds that defendants have acted in good faith. The evidence presented shows defendants' desire to construct an arena which meets the needs of wheelchair patrons and which provides the best possible sightlines to all patrons, ambulatory and nonambulatory. The management of the USAIR Arena, which currently hosts most of the events that will switch to the MCI Center next year, has consistently made every effort to accommodate these patrons, and the management of the new arena has voiced its commitment to continuing these efforts. Defendants have designed an arena which offers more wheelchair spaces with enhanced sightlines, and more choices of location, than any other constructed to this date. However, the ambiguity of the ADA regulations, and the lack of guidance and participation by the Justice Department in these matters, has created an unfortunate situation in which defendants can act in good faith and still fail to comply with the law. It is a sad predicament,[4] but it is nonetheless what the Court and the parties face today.

## I. Statutory Background and the Court's October 21, 1996 Decision

### A. The Americans With Disabilities Act

The Americans with Disabilities Act was enacted in 1990 to address what Congress found to be a "serious and pervasive social problem" of "discrimination against individuals with disabilities" in public accommodations, employment, transportation, and other areas of public life. 42 U.S.C. § 12101(a). In passing the law, Congress expressly found

---

1. *Democracy in America,* vol. 1, part 2, chapter 8.

2. The ADA authorizes this private right of action at 42 U.S.C. § 12188(a). Plaintiffs have also sued pursuant to the D.C. Human Rights Act, at D.C. Code § 1–2519. As the Court will describe below, that statute's requirements mirror those of the ADA; therefore the Court's analysis will focus on the federal law.

3. The team is scheduled to be renamed the Washington Wizards in time for the 1997–98 season.

4. In considering the complications of civil legislation, Thomas Hobbes theorized that, "The written laws, if they be short, are easily misinterpreted; if they be long they be more obscure by the diverse significations of many words." *Leviathan,* P.t. II, ch. 26. The Justice Department in the present case has foolishly decided to accept the former fate rather than risk the latter; a few more words may have clarified some of the ADA's ambiguities and delivered the parties—and the Court—from the present interpretive quicksand onto more solid ground.

that "individuals with disabilities continually encounter various forms of discrimination," including "the discriminatory effects of architectural, transportation and communication barriers" and "relegation to lesser services, programs, [and] activities." *Id.*

The ADA was passed "to provide a clear and comprehensive national mandate for the elimination of discrimination against persons with disabilities." 42 U.S.C. § 12101(b). Title III of the Act bans discrimination against persons with disabilities by owners or operators of public accommodations. It provides that:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation.

42 U.S.C. § 12182(a).

The ADA imposes different requirements on "existing facilities" than it does on "new construction." For existing facilities, the Act requires the removal of "architectural barriers ... where such removal is readily achievable," and permits the use of "alternative methods" where removal of architectural barriers is not readily achievable. 42 U.S.C. § 12182(b)(2)(A)(v). By contrast, in "new construction"—any facility designed and constructed for "first occupancy" after January 26, 1993—the Act censures the "failure to design and construct facilities ... that are readily accessible to and usable by individuals with disabilities." 42 U.S.C. § 12183(a)(1). This command to build accessible facilities is excepted only if meeting the requirements of the Act would be "structurally impracticable." *Id.* See also 28 C.F.R. § 36.401(c) (structural impracticability means "those rare circumstances where the unique characteristics of the terrain prevent the incorporation of accessibility features.").[5]

**B. Interpretive Role of the Justice Department**

The ADA itself sets out only broad principles for the elimination of discrimination against persons with disabilities. Congress granted primary enforcement authority to the Attorney General and also empowered her to issue more specific regulations for compliance with Titles II and III of the Act.[6] 42 U.S.C. § 12186(b). Congress also directed the Architectural and Transportation Barriers Compliance Board ("the Board") to issue "minimum guidelines" for Titles II and III. 42 U.S.C. § 12204(a). The Board's provisions—the ADA Accessibility Guidelines (ADAAG)—do not have any binding effect on their own, but instead help shape the Attorney General's regulations, which must be "consistent" with the ADAAG.[7] 42 U.S.C. § 12186(c). The Justice Department's Standards for Accessible Design (JDSAD), codified at 28 C.F.R. Pt. 36, App. A, are very consistent; indeed, they are exactly the same as the ADAAG.

**C. The Court's Earlier Ruling**

On October 21, 1996, the Court ruled that JDSAD § 4.33.3 requires an "enhanced" line of sight—a view of the performance floor over persons in front of them when those persons rise from their seats to stand—for wheelchair patrons at sports and concert venues. Historically, the law has not required these sightlines. Pre–ADA accessibility standards, such as the Minimum Guidelines Requirements for Accessibility Design, did not require enhanced sightlines, even though they contained essentially the same language as the ADAAG and the JDSAD.

---

5. There is no dispute in this case that the MCI Center is designed for "first occupancy" after January 26, 1993 and is therefore subject to the "new construction" requirements of the statute. Nor have defendants argued that it is "structurally impracticable" to provide a line of sight over standing spectators at all of the wheelchair locations in the arena.

6. Title III contains the sections of the ADA relevant to the present case. The interpretation of other titles of the Act has been delegated to the Department of Transportation, the FCC and the EEOC. See, e.g., 55 Fed.Reg. 50,239 (1990).

7. The Board played a similar role in the implementation of the Architectural Barriers Act of 1968. Pursuant to the 1978 amendments to that statute, the Board in 1982 enacted minimum guidelines (the Minimum Guidelines Requirements for Accessible Design), which the four federal agencies charged with enforcing compliance then used to develop the Uniform Federal Accessibility Standards in 1984.

Furthermore, the Access Board has declined to address the issue of lines of sight over standing spectators. The Board twice solicited comments on the issue, but each time it deferred decision until a later date.

However, the interpretation of the Department of Justice, and not the historical requirements or even the interpretation of the Access Board, shapes the meaning of the regulation. The Court denied defendants' motion for summary judgment and held as a matter of law that the ADA, through JDSAD § 4.33.3, requires that wheelchair-accessible spaces be dispersed throughout the seating bowl and that substantially all wheelchair locations provide an "enhanced" line of sight over standing spectators, if spectators can be expected to stand during the event.[8]

### D. The Present Trial

After the October 21 ruling, the only issues left for trial concern the compliance of the MCI Center with the ADA standards. There are few factual issues to consider. For the most part, the parties agree on what sightlines various seats provide; they disagree primarily on the legal issues of compliance. Specifically, the parties disagree on the number of seats that must provide these "enhanced" sightlines, on the required dispersal of those seats, on whether operational measures can be employed to create satisfactory sightlines, and on whether spaces in luxury suites can be counted towards the required number of enhanced sightline seats.

## II. Factual Findings
### A. The Parties

The primary plaintiff in the case is Paralyzed Veterans of America ("PVA"), a nationwide membership organization, chartered by Congress just after World War II. *See* 36 U.S.C. § 1151 *et seq.* It has 34 chapters with approximately 17,000 members nationwide, including two chapters with approximately 345 members in the Washington, D.C., metropolitan area. Almost all PVA members are wheelchair users. Some PVA members in the Washington, D.C., metropolitan area

attend sporting contests and other entertainment events.

In addition, there are four individual plaintiffs. Fred Cowell, Geoffrey Hopkins, Andrew Krieger, and Lee Page are each a wheelchair user and a member, employee, or both, of the PVA. Each of the four has attended several sporting events or concerts at various arenas in the recent past, and each is interested in attending events at the MCI Center. These plaintiffs have shown that their enjoyment of an event could be hampered if the seating bowl is built as currently designed.

The case originally had eight defendants. Two of these defendants—Ellerbe Becket Architects & Engineers, P.C. and Ellerbe Becket, Inc., were dismissed from the case pursuant to this Court's decision on July 29, 1996. A third defendant, D.C. Arena Associates, Inc, was dismissed on August 22, 1996.

The remaining five defendants are D.C. Arena, L.P., Washington Sports & Entertainment, Inc., Centre Group, L.P., Abe Pollin Sports, Inc., and Abe Pollin. Each defendant is a person or an entity that will "own" or "operate" the MCI Center, within the meaning of the ADA. 42 U.S.C. § 12182(a). The ground lease for the site permits DCALP to operate the building for 30 years, with the possibility of two ten year extensions.

### B. The Structural Design of MCI Center

The MCI Center is designed as a "multipurpose" facility, which will include a seating bowl for sporting and entertainment events, offices for arena and team officials, and a large commercial area. Designs for the arena were chosen in January of 1995, and ground was broken in October of that year. Since that time, construction has proceeded rapidly, and much of the structure for the upper seating bowl is in place. Despite this rapid construction schedule, defendants have on several occasions represented to the Court that they could, even at this late date,

---

8. The Court issued a bench ruling stating its decision and will be issuing a written opinion on those issues; therefore it will not revisit them here. Furthermore, although the parties put on evidence at trial which is relevant to the issues of regulatory history and statutory interpretation, the Court will not deal with that evidence in this opinion.

implement changes in the seating bowl to comply with ADA regulations.

The arena will host a range of activities, including basketball and hockey games, concerts, and other entertainment events. To accommodate this variety of attractions, the spectator seating bowl is designed to be reconfigured for different events. At this date, there are four such designs: the "Basketball", "Hockey", "360 Stage" and "270 Stage" configurations. The arena is designed to have three seating levels for the general public: the lower bowl, the Club level, and the upper bowl. The expected general seating capacity for these arrangements is 17,989 for basketball, 17,240 for hockey, 18,468 for the 360 stage, and 16,249 for the 270 stage. The general seating levels provide for 189 wheelchair spaces in the basketball configuration, for 182 in hockey, for 213 in the 360 stage, and for 165 in the 270 stage wheelchair seating locations. There are wheelchair spaces provided at every level of the seating bowl.

There are also 109 suites on two levels, with a total seating capacity of approximately 1,600 persons.[9] Each of these suites is designed with a wheelchair space (one suite contains two spaces) in the second row of seating. The suites will be privately leased as entire entities, for terms of 3, 5, 7, or 10 years, at a cost of approximately $100,000 to $175,000 per year. Most suites have been sold to corporations. There is not currently any plan to make seating in suites available for purchase by the general public.

It is reasonable to expect that at many sporting and entertainment events to be held at the MCI Center, spectators who are able to do so will stand during particularly interesting, exciting, or significant portions of the event.[10] The parties have stipulated to this expectation and also supported it with testimony at trial. Such standing will block the view of many wheelchair patrons, who will be unable to see over the ambulatory spectators.

It is undisputed that several seats in each configuration already provide such an enhanced line of sight over standing spectators. There are 64 such seats in the lower bowl (38 in the 270 stage configuration),[11] mostly in the two endzones, and 7 in the Club level (six in hockey, three in 270 stage). Therefore, the basketball and 360 stage configurations provide 71 seats which already comply with ADA regulations, and the hockey and 270 stage provide 70 and 41 such seats, respectively. Most of the sightline skirmishing in this litigation has concerned the compliance of 72 upper bowl seats and the counting of the 110 seats in the luxury suites.

Defendants have proposed two policy-oriented solutions to the sightline problem in the upper bowl seats. First, they propose to withhold from sale those seats in front of wheelchair patrons. This measure was used at the Olympic Aquatic Center to bring some wheelchair spaces into ADA compliance. Defendants have proposed that they would cover or remove the unsold seats to prevent ambulatory patrons from moving down into them once play has begun. Plaintiffs' expert conceded at trial that this policy is akin to a design solution to the sightline problem, and is not merely an operational measure.

Second, defendants propose to implement an "education and enforcement" policy which would discourage patrons seated in front of

---

9. Unlike the general bowl areas, the suites have flexible seating capacities. Each suite consists of a seating area and a "living room" area, and each is configured to seat at least twelve persons. However, most can accommodate up to 24 persons, depending on the wishes of the suite's occupants. Therefore, the total seating capacity of the suites depends in large part on the requirements of the individual suite lessors.

10. This is true only of the general seating bowl, however. In the suites, it is not likely that spectators will stand and block the view of wheelchair patrons, since the atmosphere in suites is different from that of the general seating bowl. The suites are more akin to private viewing areas

or clubs, where a combination of the different atmosphere and more comity will probably eliminate the problem of obstructed sightlines for wheelchair patrons.

11. This number is not fixed. It assumes that defendants will be able to seat 52 wheelchair patrons in the end zone areas. In order to do this, defendants would have to seat eight companions in folding chairs, should all 52 wheelchair seats be sold. For purposes of this opinion, the Court will assume that the maximum number of wheelchair seats will be provided, as even the plaintiffs have suggested.

wheelchair patrons from standing up during play. Under this policy, there would be signs posted which described the policy, and employees would be stationed to remind ambulatory patrons not to stand. Defendants have successfully implemented operational policies in the past, including a "no-smoking" policy and a policy against standing in aisles during play at hockey games. Defendants have not yet finalized their proposals, but the current plan is to implement the "no-sell" policy at concerts and shows and to implement the "no stand" policy at sporting contests.

There are also issues concerning the dispersal of wheelchair spaces, particularly in the lower bowl. Even defendants' own experts concede that the seats in the lower bowl which offer enhanced sightlines are not well dispersed. Most of these seats are ghettoized in the two end zones, with only a few in the front rows and almost none in the center court sections. Those center court locations are among the most popular, and generally the more expensive, seating locations. In the upper bowl, wheelchair seats are dispersed throughout all the sections, offering a wide range of seating options.

### C. Architectural Issues in the Design of Wheelchair Seating

The design of wheelchair seating is a complex architectural process, particularly in arenas, where space is more limited and angles are more steep. This is especially true for the design of the MCI Center, which is more innovative and complex than most arenas. However, even for the MCI Center, it is possible and feasible to design wheelchair locations that meet the triumvirate of ADA accessibility requirements: integration, dispersal, and enhanced sightlines. While a design cannot fully pursue each of the three features—perfect integration is incompatible with enhanced sightlines, for example—architects need not sacrifice one goal to achieve another, as defendants argue. Instead, a design can substantially meet all three goals,

combining enhanced sightlines with substantial integration and adequate dispersal. Wheelchair users would not choose to forego enhanced sightlines in order to achieve better integration or dispersal,[12] and a new arena like the MCI Center can be designed so that they do not have to.

### D. Justice Department Development of ADA Requirements

The ADA requires facilities that are "readily accessible to and usable by" persons with disabilities. 42 U.S.C. § 12183(a). The Department of Justice Standards for Accessible Design have generally defined "accessible" and have provided a broad guide to assessing compliance with the ADA. JDSAD § 4.1.3(19) provides a chart which details how many wheelchair accessible seats an arena must provide. For an arena such as the MCI Center, which seats more than 500 persons, this standard requires that there be six seats, plus one for every hundred total seats in excess of five hundred. This is commonly referred to as the "one percent plus one" requirement familiar to architects and builders. There is evidence that the Justice Department may lower this requirement to one-half percent plus one, but that change has not yet been implemented.

Other standards are not as mechanical, clear, or useful as § 4.1.3(19). The most important provision for this litigation is § 4.33.3, which reads in relevant parts:

*Placement of Wheelchair Locations.*

Wheelchair areas shall be an integral part of any fixed seating plan and shall be provided so as to provide people with physical disabilities a choice of admission prices and lines of sight comparable to those members of the general public ... When the seating capacity exceeds 300, wheelchair spaces shall be provided in more than one location. Readily removable seats may be installed in the wheelchair spaces

12. Defendants cited studies which recommend that arenas and stadia seek better integration while sacrificing sightlines in a certain percentage of wheelchair locations (usually 30%–50%), in order to give wheelchair users this choice. The Department of Justice has not adopted these proposals, and there is no evidence that wheelchair patrons would accept seating in which their view of the game is blocked, even if such seating provided excellent integration with other spectators.

when the spaces are not required to accommodate wheelchair users.

This standard raises and discusses the three technical components of "accessibility" in wheelchair seating: sightlines, integration, and dispersal. Even though § 4.33.3 raises these requirements, however, it provides no firm guidance for gauging compliance. The only direction for courts and parties comes from the actions and interpretations of the Department of Justice.

The Justice Department has interpreted its regulation, but it has done so informally, eschewing rulemaking procedures. The Department has not established a single, clear interpretation, but has instead left a nebulous record, comprised mostly of informal documents, press releases, announcements, and correspondence. This has not provided clear guidance to architects, who have been left with at best an educated guess as to the design features required to comply with ADA regulations.

The Justice Department decided against a rulemaking process, which would have left a concrete, workable record from which to discern a standard. It has further declined invitations to participate in the present litigation to explain its interpretation. Finally, neither party called witnesses who could shed anything brighter than speculative light on the interpretation of § 4.33.3. Therefore, the only evidence before the Court is the hazy tapestry of action and inaction which the Justice Department has woven since Title III took effect in 1992.

Prior to 1993, the Department did not officially insist on enhanced lines of sight; indeed, in one case the Deputy Chief of the Public Access Section explicitly told Major League Baseball owners that the ADA did not require enhanced sightlines. Since that time, the Department has discussed the issues of sightlines and dispersal, but the Technical Assistance Manual Supplement of 1994 and the May 1996 "Accessible Stadiums" release are the only public statements to suggest a requirement of enhanced sightlines. These remain the most current statements of the Justice Department's interpretation of these issues, however, and the Court held on October 21 that they state the interpretation which binds the parties.

However, the Justice Department has not established a clear record of exactly what its interpretation requires. With the exception of a single, general diagram in the 1996 "Accessible Stadiums" release, the Department has not defined or documented the technical specifications for compliance, even though, as defendants demonstrated at trial, there are several possible methods of measuring sightlines.[13] The application of the theoretical issues of sightlines to the design of an actual arena is a complex problem; this problem has been exacerbated by the lack of concrete, technical standards for architects to follow.[14]

To further complicate matters, the Department of Justice has not insisted on full compliance with the enhanced sightline provision. The 1996 "Accessible Stadiums" release requires only that "all or substantially all" seats provide enhanced sightlines. In practice, the Justice Department has never required more than substantial compliance. The Justice Department has never maintained an enforcement action against an arena or stadium under design or construction, although several that have been designed

---

13. Among the variables to consider are the eye height of the wheelchair user, the height of standing spectators, the depth within the tread row of the spectator and wheelchair user, and the focal point on the floor from which measurements are calculated. Use of a different figure, called an "androgyne" within the design industry, can mandate different architectural measurements to provide enhanced sightlines. This flexibility was demonstrated in the analysis of the Club Level seating in the Atlanta Olympic Stadium; use of differently sized androgynes (each within the accepted range of sizes) produced different measurements of sightlines.

14. While some standards may exist, they are not readily available. There is evidence that the Department may undertake a study to promulgate such specifications, but it has not yet published any results. Furthermore, while technical specifications may have been decided upon in connection with the Atlanta Olympic facilities, these specifications were part of confidential settlement negotiations and are therefore of no help to the general population of architects.

since 1994 have failed to comply even substantially with the goals stated by the TAM. The Department even declined to enforce its standards against the MCI Center in the present litigation.

The Justice Department has only commented publicly on these issues in connection with its "settlement" on the Atlanta Olympic facilities, and these stadia demonstrate the flexible approach of the Department's standards. In an official press release dated May 15, 1996, the Justice Department called the Atlanta Olympic Stadium "the most accessible stadium in the world" and held it up as "the model for all future stadiums." That stadium offers at best substantial compliance with the ideals expressed in the 1994 TAM and 1996 Accessible Stadiums release. The lower deck provides dispersed seating with enhanced lines of sight, but the upper deck, which contains 15,000 seats, offers neither— it has zero wheelchair spaces with lines of sight over standing spectators. In addition, the wheelchair spaces on the Club level provide clear lines of sight only for the tallest of wheelchair users. The Atlanta Olympic Stadium operators achieved substantial compliance, but they did so in part by masking the deficiencies in the cheapest seats and offering wheelchair patrons seating in the fully compliant lower deck for the price of an upper deck ticket. Similarly, the Olympic Aquatic Center seating was not compliant, but it became so when wheelchair patrons were relocated to better seats and when certain seats in front of those patrons were left unsold.[15]

## III.   Conclusions of Law

The Court must examine the design of the MCI Center to determine whether it is in compliance with the ADA as interpreted by the Justice Department. In order to do so, the Court must determine what the Justice Department interpretations require, and must also apply those requirements to the proposed designs for the arena. The Court appreciates the need to give guidance to the parties, so that a compliant arena may eventually be designed and built. However, it does not wish to become the de facto supervisor of the design-build team for this project. Therefore, while the Court will make the conclusions of law to give the parties necessary guidance, it will not impose or suggest changes. Instead, it remains the parties' responsibility to arrive at solutions to the current compliance problems.

### A.   Applicable Standard

The ADA requires that new facilities be "readily accessible to and usable by" persons with disabilities. 42 U.S.C. § 12183(a). The Justice Department has issued its Standards for Accessible Design, which describe, among other things, the features of a "readily accessible" facility. As the Court held in its October 21, 1996, opinion, JDSAD § 4.33.3 requires that wheelchair seating have a line of sight over standing spectators in a new construction which hosts events where spectators may be expected to stand. Pursuant to that same regulation, "readily accessible" wheelchair seating must also be reasonably integrated and dispersed throughout the seating bowl. Since spectators can be expected to stand at MCI Center events, the arena must, in light of the Court's earlier ruling, provide seating with "enhanced" sightlines over standing spectators.[16]

---

15.   In the Aquatic Center, operational measures were employed only in the "temporary" seating areas. This fact is not relevant, however, since the Department of Justice recognized no difference in the requirements of compliance between the permanent and temporary seating.

16.   Defendants argue that enhanced sightlines provide wheelchair users with a superior view, since even ambulatory spectators lose some of their visibility when other spectators are standing. This is certainly true. However, when an ambulatory spectator is blocked by persons standing in front of him, he can himself stand and regain 90% of his view. A wheelchair user cannot do this, and in most of the non-enhanced locations in the MCI Center will be afforded nearly no visibility of the arena surface when spectators are standing. The Court is thus faced with a choice between requiring the superior, enhanced views or accepting the completely eclipsing, unenhanced views. The choice is an easy one. The enhanced view can be described as a "comparable," though perhaps slightly superior, line of sight, while the unenhanced simply cannot be. Therefore, the Court has no difficulty requiring these enhanced lines of sight, pursuant to the regulation.

However, it is clear that these requirements are flexibly applied. The Court is unable and unwilling to poke through the myriad of announcements, press releases, and threatened legal actions and to extract specific, technical standards where even the Justice Department has not seen fit to do so. The Court is particularly unwilling to define new standards in the context of an indoor arena, which is far more difficult to design and build than an outdoor stadium such as the Atlanta Olympic facility. Instead, the Court can only apply the flexible approach employed by the Department of Justice and seek to ensure substantial compliance with the accessibility requirements of enhanced sightlines, dispersal, and integration.

Paramount within this flexible approach is the concept of substantial compliance, especially in regard to sightlines. The Department of Justice has never used JDSAD § 4.33.3 to require that 100% of the wheelchair seating provide enhanced sightlines. Instead, taking the Olympic Stadium for a model as the Justice Department has directed, a facility is in compliance with the ADA regulations if a substantial percentage of seats provide these sightlines.

It is not the role of the Court to define "substantial percentage" in arbitrary, numerical terms Instead, the Court must examine the submitted design and determine whether it meets the flexible test of substantial compliance which the Department of Justice has enforced. Applying this standard, the Court concludes that the MCI Center does not currently comply with the ADA regulations, but that defendants may be able to implement some moderate changes to achieve compliance.

### B. Number of Locations Required

As currently designed, the MCI Center provides more wheelchair locations than are required by the "one percent plus one" formula of § 4.1.3(19). In order to comply with § 4.33.3, a substantial percentage of the *required* locations must be "accessible;" however, *extra* spaces above the required number are not affected by § 4.33.3. Therefore, it is the percentage of required wheelchair spaces with enhanced sightlines which must be substantial, not the percentage of total spaces.

Before the Court can determine how many wheelchair locations are required by § 4.1.3(19), it must first determine which seating areas are included in the general seating capacity. After making that determination, the Court can calculate the number of required wheelchair locations and can also determine which seats can be counted toward compliance with § 4.33.3.

■ In making this determination, the Court is guided by the Department of Justice Standards, which require that each "definable area, e.g., a room" comply on its own. See JDSAD §§ 3.5, 4.1.1(1). Under this standard, the floor seating, the Club Level, and the lower and upper bowls are areas that are open for public purchase and are part of one general seating area, and these areas are counted in the general seating capacity. Defendants claim that the suites should also be considered part of this general area. The suites, however, are enclosed and segregated from the general seating bowl. They are not really available for purchase by the general public; to purchase suite tickets, a person must lease an entire suite. This is far more prohibitive than even the purchase of season tickets which is required in the Club Level, and it is in keeping with the notion that the suites are private viewing areas, not accessible to the public.[17] Because they are so separated from the general seating areas, the seats in the suites are not counted toward the compliance of the general seating bowl.[18]

---

**17.** Furthermore, if the wheelchair seats in the suites were counted towards compliance with ADA regulations, then an insurmountable dispersal problem would result. The suite seating, which is far beyond the reach of most persons, whether wheelchair bound or ambulatory, would account for 60% of the required wheelchair seating, while the spaces in the endzones would account for a further 30%, leaving wheelchair patrons with a choice primarily between those two types of seating. This choice between the condo and the ghetto is not compatible with the dispersal requirements of § 4.33.3, nor with the remedial spirit of the ADA.

**18.** The suites themselves must of course comply with the requirements of § 4.33.3, which they do. Each suite seats 12–24 persons, and each in-

Therefore, JDSAD § 4.1.3(19) does not include suite seating in the general capacity figures; its "one percent plus one" formula applies only to the three general seating levels. Therefore, 181 spaces are required for basketball, 173 spaces for hockey, 186 spaces for the 360 stage, and 163 spaces for the 270 stage. To comply with § 4.33.3, these spaces must be integrated and dispersed throughout the bowl, and they must provide a line of sight over standing spectators.

### C. Integration

JDSAD § 4.33.3 requires wheelchair spaces to be "an integral part of any fixed seating plan." There is no real disagreement that the designed wheelchair seating is sufficiently integrated into the fixed seating plan or that it meets the ADA's horizontal and vertical integration requirements. Plaintiffs raise the integration issue in connection with the proposed "in-fill" seating in the arena, but they fail to demonstrate that it is truly at issue. Although defendants have not yet finalized the design of the "in-fill" seating, they have testified that they expect it to consist of small platforms, with only a few seats·on each.[19] Therefore, plaintiffs' fears that the in-fill areas will be vast wastelands within which one or two isolated wheelchair patrons will be seated are unsubstantiated.[20] Should defendants reverse their present thinking and install retractable seating, plaintiffs may later have a cause of action, but that claim is not yet ripe.

### D. Sightlines

This is the core issue of the litigation. Pursuant to the JDSAD § 4.33.3, the ADA requires that wheelchair locations have "lines of sight comparable to those of the general public." As the Court decided on October 21, sightlines of wheelchair locations are "comparable" only if a substantial number have a line of sight over standing spectators.

Under the current design, many lower bowl and club level locations provide these enhanced sightlines. It is undisputed that the basketball and 360 stage designs contain 71 enhanced spaces, and that the hockey and 270 stage designs provide 70 and 41 spaces, respectively. Defendants suggest postconstruction policies to bring other wheelchair spaces into compliance with § 4.33.3's sightline requirements. They specifically propose two such policies: a "no-stand" policy for persons sitting in the rows in front of wheelchair patrons and a "no sell" policy for those seats. These policies would go into effect in the upper bowl only, and would affect the 72 wheelchair spaces in the third row of the upper bowl.

### 1. Education and Enforcement Policy

■ The "no-stand" policy, which defendants call the "education and enforcement" measure, would supposedly prevent persons from standing up in front of wheelchair patrons. Therefore, since all the wheelchair seats in the arena give a clear line of sight over seated spectators, wheelchair patrons would not have their views blocked. There are two problems with this policy, however. The first is that it is clearly an operational, not a design, solution. The ADA permits "alternative methods" such as operational measures to remove architectural barriers in existing facilities. 42 U.S.C. § 12182(b)(2)(A)(iv), but imposes different requirements on new facilities. For new structures, the ADA requires that the design and construction provide ready access to individuals with disabilities. 42 U.S.C. § 12183(a)(1). Therefore, a purely operational solution is insufficient to secure com-

cludes 1–2 wheelchair spaces. This is a sufficient percentage, and each wheelchair space is integrated and provides an unobstructed line of sight. The issue of dispersal is not germane to the individual suites; however, since each suite includes at least one wheelchair space, the suites which are wheelchair accessible are perfectly dispersed throughout the suite levels.

**19.** Standard 4.33.3 specifically permits the use of "readily removable seats" for use when spaces

are not needed for wheelchair patrons. The type of "in-fill" seating proposed by defendants falls within this category of permitted seating.

**20.** If anything, plaintiffs have argued that the seating is too integrated, and that lines of sight have suffered from the failure to place wheelchair spaces further above those seats in front of them.

pliance for a new construction such as the MCI Center.

The second problem is that the policy would impermissibly single out wheelchair patrons for attention. The policy against standing would only be in effect in sections where wheelchair patrons are located; therefore all ambulatory patrons in the arena will be permitted to stand during play, except those seated in front of wheelchair patrons. This situation presents the very real danger of subjecting wheelchair users to resentment or hostility. The ADA prohibits measures that "screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12182(b)(2)(A)(i). The education and enforcement policy will single out wheelchair users and very likely prevent them from fully enjoying the camaraderie and fellowship of a sporting contest or other event. As such, it is an impermissible solution to the sightline problem.

Therefore, defendants cannot rely on the education and enforcement policy to bring these 72 seats into compliance. That policy, even if it were successful,[21] is not the type of design or construction accommodation that the ADA mandates for new facilities.

### 2. No Sell Policy

■ Defendants' second proposal is different, however. Under this policy, defendants would withhold from sale the seats in front of wheelchair patrons. These seats would either be removed or altered with "an attractive cover" to keep them unoccupied. This solution is more a design feature than an operational measure. The policy relies on structural means, much like the "in-fill" seating arrangements that are undeniably in compliance with ADA regulations. Unlike the education and enforcement policy, the "no-sell" policy would not force other patrons to curtail their activities in order to accommodate wheelchair users; everyone in the arena would be able to stand and cheer if they wished. This policy would not, therefore, run the risk of exposing wheelchair patrons to extra attention.

Plaintiffs' own expert testified that he believed this policy was a design solution, not a purely operational one. Furthermore, a similar measure was approved by the Department of Justice at the Olympic Aquatic Center, thus suggesting that the policy complies with ADA regulations. Therefore, the policy of withholding seats from sale is a design and construction accommodation that is permitted by the ADA for new construction, and it could be an option for defendants to bring the seats in the upper bowl, and perhaps elsewhere, into compliance with the sightline requirements of the ADA.[22]

### 3. Overall Compliance

If defendants bring the upper bowl spaces into compliance with the sightline requirements of § 4.33.3, they would have well over 100 wheelchair locations which provide unobstructed lines of sight. The ADA requires that a substantial percentage of the required wheelchair spaces must provide such lines of sight; by following a combination of current designs and proposed policy, it appears likely that defendants could meet this goal.[23]

21. The Court does not doubt that spectators at an arena event would respect the needs to wheelchair patrons around them, but it cannot say for sure that this policy would be sufficient to correct the problem of standing spectators in the heat of an exciting event. Defendants have stated that they would not eject patrons who stand in violation of the policy, nor do they have enforcement procedures more forceful than polite reminders. However, it is not necessary for the Court to decide this issue, since there are other reasons why defendants cannot rely on this policy to bring the upper bowl seats into compliance.

22. A certain amount of integration may be lost from the implementation of this policy, since two rows of seats will sit empty in front of wheelchair patrons. This does not pose a compliance problem. Enhancement of sightlines necessarily causes some loss of vertical integration, and a reasonable loss of integration does not affect compliance under § 4.33.3. Furthermore, the same loss of integration would result from moving the wheelchair locations to the first row of the upper bowl, which is unquestionably a compliant solution.

23. If 72 upper level spaces are brought into compliance, then between the three general seating levels, the basketball and 360 stage configurations would each provide 143 enhanced spaces, the hockey configuration would provide

## E. Dispersal

■ Finally, JDSAD § 4.33.3 requires that wheelchair spaces be dispersed throughout the seating bowl so that they "provide people with disabilities a choice of admission prices and lines of sight comparable to those provided to members of the general public." Dispersal requires a choice of various seating areas, good and bad, expensive and inexpensive, which generally matches those of ambulatory spectators. Furthermore, in order to comply with the other requirements of § 4.33.3, spaces with enhanced sightlines must be dispersed; a design which segregates the spaces with enhanced sightlines cannot comply, no matter how dispersed the spaces with unenhanced sightlines may be. Because an ambulatory patron may select a seat with an unobstructed view in any section of the arena, it is not "comparable" to force a wheelchair patron to choose between a good view and a good location. Because wheelchair patrons make up only a small percentage of all spectators, there need not be wheelchair seating in every section of the arena, but there must be spaces scattered throughout a sufficiently representative number of sections in the seating bowl to provide comparable choices.

There are wheelchair spaces available in nearly every section of the upper bowl in the MCI Center design. Therefore, if defendants can bring those spaces into compliance with the ADA sightline requirement, the upper bowl will easily comply with the dispersal requirement. The lower bowl and club level do not have adequate dispersal, however. While there are 64 spaces in the lower seating bowl and seven in the club level that have adequate sightlines, almost every one of these is in the end zone sections. There are almost no spaces in the center court sections that provide a line of sight over standing spectators, even though these locations are the most popular for many events. This

arrangement does not provide wheelchair users with the choice of seating locations required by § 4.33.3.

Defendants argue that the dispersal requirement should be flexibly applied. They point to the poor dispersal of accessible seating in the upper bowl of the Atlanta Olympic Stadium—where there were no spaces with enhanced sightlines at all—in support of this argument. The Court agrees that the Justice Department has required only substantial compliance, not perfect dispersal. However, defendants would have the Court accept the argument that, because the Olympic Stadium did not offer wheelchair users a choice of the worst seats in the house (the upper deck), the MCI Center should be excused from offering a choice of the best seats (the center court locations). The comparison between the two situations is a poor one. In the Atlanta stadium wheelchair users could purchase the better, lower deck spaces, and they could choose seating in any section of the seating bowl. No such choice is afforded by the MCI Center design. Wheelchair patrons preferring center court locations would be forced into the upper deck, with no possibility of a closer view.[24]

At this point, none of the general seating levels meets dispersal requirements. The upper bowl does not have spaces with enhanced lines of sight, and spaces in the lower and club levels are ghettoized in the end zone areas. Defendants may bring spaces in the upper bowl into compliance with the sightline requirements, which would eliminate the dispersal problem in that bowl. However, the design of the lower bowl and Club levels of the MCI Center still would not meet the dispersal element of accessibility that is required by the ADA, because nearly all the accessible wheelchair locations on those levels are concentrated in the end zone sections. In order to achieve adequate dispersal, de-

142, and the 270 stage would provide 101. This means that defendants would achieve enhanced sightlines in 79% of the required basketball spaces, in 77% of the 360 stage spaces, in 82% of the hockey spaces, and in 62% of the 270 stage spaces.

**24.** Nor could the MCI Center's defect be remedied as in the Olympic Stadium. In Atlanta, the lack of accessible seating in the upper bowl was "cured" by offering wheelchair patrons lower deck seats at the less expensive, upper deck prices. No such arrangement is possible at the MCI Center, where there are no center court seats to offer in the lower or Club levels.

fendants must place wheelchair locations with enhanced sightlines into other sections on those two levels.

### IV. Plaintiffs' D.C. Human Rights Act Claim

In addition to their claims under the ADA, plaintiffs have sued under the District of Columbia's Human Rights Act, D.C. Code § 1–2519. See Amended Complaint, Count III. The D.C. courts have always looked to cases from the federal courts in interpreting the D.C. Human Rights Act, and have followed, wherever applicable, precedents from the federal courts' treatment of comparable civil rights statutes. *Benefits Communication Corp. v. Klieforth,* 642 A.2d 1299, 1301–02 (D.C.1994). See also *O'Donnell v. Associated General Contractors,* 645 A.2d 1084, 1086 (D.C.1994); *American University v. District of Columbia Commission,* 598 A.2d 416, 422 (D.C.1991); *Miller v. American Coalition of Citizens With Disabilities, Inc.,* 485 A.2d 186, 190 (D.C.1984). This Court has also applied legal standards under the ADA to claims under the D.C. Human Rights Act. *Whitbeck v. Vital Signs,* 934 F.Supp. 9, 13 (D.D.C.1996). Therefore, the D.C. law is applied in the same manner as the parallel federal antidiscrimination provisions.

Defendants' design fails to comply with the requirements of the D.C. Human Rights Act for the same reasons that it fails to comply with the ADA. Furthermore, defendants may seek to remedy their noncompliance with both statutes in the same manner.

### V. Conclusion

The MCI Center, as designed, would not be "readily accessible to and usable by" wheelchair users, as is required by the ADA. Although its seating bowl complies with the integration element required by the Department of Justice Standards on Accessible Design, it fails to comply with the sightline and dispersal elements. Under the current design, less than 40% of the wheelchair spaces required by the JDSAD provide an unobstructed line of sight when spectators stand. Furthermore, almost all of these seats are located in the end zone areas. These failures may be remedied, and defendants may alter their design so that it provides substantial seating which complies with these elements. However, it is up to defendants to devise and design these alterations. While the Court has addressed some remedies that defendants have proposed, it cannot and will not specify solutions for the sightline and dispersal problems.

The Court will issue an order that, consistent with this memorandum opinion, requires defendants to construct the MCI Center in compliance with the Americans with Disabilities Act and to submit a proposed design to the Court within 30 days.

### ORDER

As the Court has described in its accompanying memorandum opinion, it concludes that defendants' designs for the MCI Center fail to comply with Americans with Disabilities Act's requirements for accessible seating for wheelchair users. Specifically, the designs fail to provide a substantial number of the required wheelchair spaces with lines of sight over standing spectators and fail to adequately disperse the wheelchair spaces throughout the seating bowl.

For these reasons and those stated in the memorandum opinion, it is hereby

**ORDERED** that defendants' motion for reconsideration of the Court's Order denying summary judgment is **DENIED;** it is further

**ORDERED** that defendants are permanently and affirmatively ENJOINED to design and construct the facility in compliance with the Americans with Disabilities Act and with the D.C. Human Rights Act, including, in particular, to ensure that

a) the facility provides wheelchair locations for one percent plus one of the total capacity for each seating configuration;

b) wheelchair spaces in the facility provide a line of sight over standing spectators at a substantial number of the required locations;

c) wheelchair spaces that provide such lines of sight are dispersed throughout the seating bowl, including locations at each level of the bowl; it is further

**ORDERED** that within 30 days after entry of this Order, defendants shall submit to

the Court and to plaintiffs a written plan and architectural design that complies with the requirements of the Americans with Disabilities Act and the D.C. Human Rights Act; it is further

**ORDERED** that plaintiffs shall have fifteen days thereafter in which to respond in writing to defendants' proposed plans and designs.