**COLORADO CROSS–DISABILITY CO-ALITION, a Colorado Corporation, Jeremy Hudson, and James Hudson, Plaintiffs,**

v.

**COLORADO ROCKIES BASEBALL CLUB, LTD., a Colorado limited partnership, Defendant.**

**Carrie Ann Lucas, for herself and as next friend of Heather Rebekah Lucas; Sherwood Owens, for himself and as next friend of Nicholas Owens; Kyle Stubbs; Roanne Kuenzler, and Evan Stutman, Plaintiffs,**

v.

**COLORADO ROCKIES BASEBALL CLUB, LTD., a Colorado limited partnership, Defendant.**

Civ.A. Nos. 03–WY–0034–AJ, 03–WY–1097–AJ.

United States District Court, D. Colorado.

April 2, 2004.

**1142**

Amy Farr Robertson, Fox & Robertson, P.C., Denver, CO, for Plaintiffs.

K. Preston Oade, Jr., Holme, Roberts & Owen, LLP, Denver, CO, for Defendant.

## ORDER DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

ALAN B. JOHNSON, Chief Judge.

The defendant's Motion for Partial Summary Judgment and the plaintiffs' responses in opposition to the motion came on for hearing March 11, 2004. At the hearing, counsel for the parties appeared and presented their respective arguments. The Court, having considered the arguments of counsel, the parties' written submissions and accompanying materials, the applicable law, the pleadings of record, and being fully advised, FINDS that the defendant's motion for partial summary judgment should be DENIED, for the reasons stated below.

### Background

In these two consolidated cases, the plaintiffs assert that defendant has violated the Americans with Disabilities Act ("ADA") in certain respects, particularly including the failure to provide appropriate seating to those required to use wheelchairs when attending a baseball game in the facility used by the Colorado Rockies. The defendant, not surprisingly, disagrees with plaintiffs' contentions. For the reason that this case will soon be coming before the Court for a bench trial in April of 2004, which will require more thorough and fully developed background and factual recitations in the final Findings of Fact and Conclusions of Law, this Order will not spend significant time and resources on such factual development.

In the motion considered herein, Defendant ("Rockies") has moved for partial summary judgment on a single issue, stated to be as follows: whether accessible seating for the disabled may be clustered at the top of certain seating sections in Coors Field. The Rockies contend that such clustering is permitted by governing federal regulations, in particular that regulation entitled "Standard 4.33.3." 28 C.F.R. Part 36, App. A, § 4.33.3.

The Rockies argue that the ADA requires places of public accommodation to be readily accessible to and usable by individuals with disabilities. 42 U.S.C. § 12183(a)(1). Standard 4.33.3 was adopted following direction from Congress to flesh out these principles, and governs seating for disabled. The Rockies contend that Standard 4.33.3 requires accessible seating to be "integral" to any "fixed seat-

ing plan" and that accessible seating must be provided in "more than one location." Accessible seating must be dispersed both horizontally and vertically. (Horizontal dispersal is placing accessible seats "around" a stadium, the Rockies assert, so disabled patrons have a choice of seating sections; vertical dispersal means placing accessible seats throughout a stadium or arena, so disabled patrons have a choice of rows or levels in which to sit.)

The Rockies assert vertical dispersal raises unique issues for wheelchair users and those required to comply with the ADA in sporting arenas where fans may be expected to stand at exciting moments. Vertical dispersal requires a considerable increase in height from row to row to make sure a seated patron can see over the heads of those in front of him or her, with perhaps even greater increases in height where spectators in front might be expected to stand up.

The Justice Department has adopted an express exception to the "vertical dispersal" requirement of Standard 4.33.3 which the Rockies contends applies in this case. The exception provides:

> EXCEPTION: Accessible viewing positions may be clustered for bleachers, balconies, and other areas having sight lines that require slopes of greater than 5 percent. Equivalent accessible viewing positions may be located on levels having accessible egress.

In the Rockies' view, this exception permits accessible seating to be clustered at the top of seating sections so disabled patrons have a view over the heads of other persons. The Rockies believe that the exception permits Coors Field to cluster accessible seats at the top, as depicted in page 4 of the Rockies' brief. The Rockies argue the exception applies to any "area" and permits clustering whenever areas have "sight lines that require slopes of greater than 5 percent." The exception

permits clustering "where aisles are sloped or stepped and where the pitch of the line of sight is greater than 5%," which is the case at Coors Field. The defendant contends that, as a matter of law, Coors Field may vertically cluster accessible seating at the top of seating sections.

The plaintiffs oppose the motion for partial summary judgment. The plaintiffs argue that under the ADA, Coors Field must provide wheelchair accessible seating which is integrated into the seating plan of the arena, dispersed throughout all seating areas and providing lines of sight and choices of admission prices comparable to those for the general public. Coors Field was constructed after the effective date of the ADA. Initially, there were only a small number of wheelchair accessible seats near the infield on the lower level and the rest of the wheelchair accessible seats in those seating areas are behind the back row under an overhang. Although in plaintiffs' view this seating arrangement did not fully satisfy the integration, dispersal and comparable line of sight requirements of the ADA, the Rockies charged the same price for these seats as it did for ambulatory seats near the infield, permitting some fans with disabilities to sit near the infield for the same price as non-disabled fans.

However, in 2001, the Rockies created a high-priced luxury seating area which absorbed the only wheelchair accessible seats near the infield. After this change, fans in wheelchairs cannot now sit near the infield unless they are willing to pay "luxury" prices (over $100) for a ticket, while non-disabled fans can obtain a seat in the infield at non-luxury prices significantly less than $100. The other available option to fans in wheelchairs desiring to sit near the infield is to sit behind the back row of ambulatory seating in the infield seating areas. This violates the ADA, in plaintiffs' view.

Plaintiffs argue the exception upon which the Rockies have relied to support their motion for partial summary judgment is without merit, because (1) it does not excuse compliance with the requirements for integration, comparable prices and dispersal for wheelchair accessible seating (which requires wheelchair accessible seating in front **and** back of the seating areas at issue); (2) the exception requires the defendant to provide equivalent accessible seats on levels where accessible egress exists and because accessible egress does exist at field level, the Rockies may not cluster wheelchair accessible seating behind the back row; and (3) if the Court does not rule in favor of plaintiffs at this time, there remain disputed issues of material fact as to whether the defendant has complied with the ADA.

At present, the "Infield Box" seating area, including sections 120 through 141, on the lower level, includes seats sold for $27–38. The "Midfield Box" includes Sections 116–119 and 142–145 on the lower level, with 2003 seats sold for $21.50–32. The "Outfield Box" seating includes sections 110–115 and 146–150 on the lower level, with 2003 seats sold for $20–32. These areas have been collectively referred to as the "Lower level Box" seating area—all with seats selling for $38 or less in 2003. The only wheelchair-accessible seating in the Lower Level Box is behind the back row of each section, in most cases 38 rows from the field.

When Coors Field was constructed, it had 8 wheelchair and 9 companion seats in the front row of Section 132 of the Infield Box seats, directly behind home plate ("Backstop Accessible Seats"). These were the only wheelchair accessible seats near the front of any of the Lower Level Box seating area, and from 1995 to 2000, these seats sold for the same price as all other Infield Box seats. In 2001, the Rockies converted the first few rows of seating behind home plate, including the Backstop Accessible Seats, into a premium seating area called "Coors Clubhouse." This area includes 168 ambulatory seats and the 8 wheelchair accessible and 8 companion seats. Ambulatory seats in the front row of Coors Clubhouse sell for $150; the other rows are $135. The price includes a pre-game buffet, non-alcoholic beverages, in-seat wait staff service and preferred parking and are largely sold on a season ticket basis. Now that the Backstop Accessible seats are part of the Coors Clubhouse seating area, they cost $100. This prices includes the amenities listed above except the pre-game buffet. These tickets are sold only on the day of the game; fans with disabilities cannot purchase them in advance. These are still the only wheelchair accessible seats near the infield; Coors Field has 210 ambulatory seats in the first row the Infield Box seating area and 1,017 ambulatory seats in the first five rows of that seating area (all $27–38). There are 383 front row ambulatory seats in the Lower Level Box seating area; 1,996 ambulatory seats within the first five rows of those areas, all $38 or less. In 2001, a wheelchair using fan who wanted to sit at Coors Field had to pay approximately three times as much as most nondisabled patrons to sit near the infield.

Wheelchair accessible seats behind the back rows of Sections 114–126 and 135–147 of the Lower Level Box seating areas are under the overhang created by the Club Level seating area; wheelchair accessible seats behind Sections 127–134 are under the somewhat less severe overhang of the press box. Plaintiffs contend that fans in the wheelchair accessible seats under the overhang have restricted sight lines. They are unable to see pop foul balls, pop fly balls and home runs. The trajectory of a high fly ball is obstructed by the overhang. Few rows of the ambulatory seats in the Lower Level Box are similarly af-

fected by the overhang. All wheelchair accessible seats are obstructed by the overhang; 9,225 ambulatory seats are completely unaffected by that obstruction. Wheelchair accessible seats behind the back row of the Lower Level Box do not provide views or lines of sight comparable to ambulatory seats in the front row or close to the infield.

Plaintiffs argue that Coors Field has 406 wheelchair accessible seats. Of these, only 12% are located at the front of their respective seating areas; the remaining 88% are located in the back of their respective seating areas. Only 16% of the wheelchair accessible seats on the Lower Level of Coors Field are in front of the seating area; these seats are either the $100 Backstop Accessible Seats or seats beyond the outfield in the Pavilion seating areas.

Plaintiffs argue that the ADA requires the defendant to provide wheelchair accessible seats dispersed throughout the Lower Level Box seating areas, located so as to provide a choice of lines of sight and views comparable to those of the general public and integrated into the seating plan, and offered at prices comparable to those offered to the general public. In their brief, plaintiffs assert that "Coors Field does not currently satisfy these requirements. Defendant can remedy this situation by constructing wheelchair-accessible seats near the infield in the non-luxury Lower Level Box seating areas. However, Plaintiffs would be satisfied with a resolution in which Defendant simply sells some of the Backstop Accessible Seats at Infield Box prices, as it did from 1995 to 2000." Plaintiffs' Brief at 9–10.

Plaintiffs argue the exception the Rockies rely upon, if it applies, only excuses defendant from constructing wheelchair accessible seats in the middle rows of the Lower Level Box seating areas; it permits clustering at the back and front of these areas. It does not, as defendant has ar-

gued, permit the Rockies to cluster **all** of its wheelchair accessible seats only at the back of the seating area. It must provide wheelchair accessible seats at all levels having accessible egress, including the field level of Coors Field where there does exist accessible egress. Finally, plaintiffs urge that there are questions of fact in dispute, depending on the relative quality of wheelchair accessible seats in the back, and the ambulatory seats in the front of the at-issue seating areas.

### Discussion

The Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, was passed in 1990. Title III of the Act prohibits disability discrimination by those who own or operate places of public accommodation. Title III addresses architectural accessibility. To comply, a facility must be built in conformance with Department of Justice ("DOJ") Standards for Accessible Design. 28 C.F.R. Pt. 36, App. A. In passing the ADA, Congress recognized that "[h]istorically, persons with disabilities have been relegated to separate and often inferior services. For example, seating for persons using wheelchairs is often located in the back of auditoriums. In addition to providing inferior seating, the patron in a wheelchair is forced to separate from family or friends during the performance." H.R.Rep. No. 101–485, pt. 2 at 102 (1990), U.S.Code Cong. & Admin.News 1990, pp. 303, 385.

DOJ's Standard 4.33.3, governing assembly areas such as Coors Field, requires:

> [w]heelchair areas shall be an integral part of any fixed seating plan and shall be provided so as to provide people with physical disabilities a choice of admission prices and lines of sight comparable to those for members of the general public. ... At least one companion fixed seat shall be provided next to each

wheelchair seating area. When the seating capacity exceeds 300, wheelchair spaces shall be provided in more than one location.

An exception is provided:

Accessible viewing positions may be clustered for bleachers, balconies and other areas having sight lines that require slopes of greater than 5 percent. Equivalent accessible viewing positions may be located on levels having accessible egress.

Plaintiffs have argued that the "Bleacher/Balcony Exception" is "not an exemption from requirements for integrated or companion seating or choice in admission prices. Where dispersion is feasible, it must be achieved[,]" citing ADAAG Manual at 117. Plaintiffs assert this exception only excuses defendant from dispersing wheelchair accessible seats to rows or tiers in the middle of the Lower Level Box seating areas; it does not excuse it from providing wheelchair accessible seats at comparable prices on levels having accessible egress, including the front of those seating areas.

Standard 4.33.3 requires dispersed seating throughout all seating areas and a choice of admission prices and views comparable to those for the general public. The Court has reviewed the cases cited by the parties, as well as others, and finds that the plaintiffs have presented the more persuasive arguments. At Coors Field, choices of wheelchair patrons do not generally match those of ambulatory spectators. To sit near infield, they must pay at least $100, while non-disabled fans can do so for $20–38. All wheelchair accessible seats in the Infield Box and Midfield Box, and many in the Outfield Box, are under an overhang; non-disabled patrons have a choice of thousands of seats in those areas not obstructed by the overhang.

Locating the wheelchair accessible seats at the back of the Lower Level does not provides comparable lines of sights for wheelchair patrons. These seats are also not integrated. Section 4.33.3 requires wheelchair areas to be an integral part of any fixed seating plan, and has been construed by the DOJ to require "'theater operators to provide wheelchair seating in the area of the theater where *most* members or the general public usually choose to sit.'" *Meineker v. Hoyts Cinemas Corp.*, 69 Fed.Appx. 19, 2003 WL 21510423, at *23 (2d Cir.2003). At Coors Field, all wheelchair accessible seating in the Lower Level Box is at the back of the seating area, behind where most people sit, not among the general public seating. Choices of prices for wheelchair seats also are not comparable to those of the general public.

Here dispersal is feasible. It existed physically when the Infield Seating Box area was initially opened at Coors Field. It has been changed only by the application of the defendant's pricing policy. Wheelchair accessible seats with Field Level access cost three times as much as most ambulatory seats at or near Field Level.

Even if the exception is construed to permit clustering only at the back of a seating area, plaintiffs contend the defendant must provide accessible viewing locations equivalent to the infield box seats in the Coors Clubhouse—i.e., sell part of the Coors Clubhouse accessible seats at Infield Box prices. The effect of the exception, if applied as the defendant has urged, is to permit defendant to cluster wheelchair accessible seating at the back of the Lower Level Box seating area, thus denying fans with disabilities any seats equivalent to almost 2,000 ambulatory seats in the first five rows of these areas.

The clear language of Standard 4.33.3 requires fans with disabilities be provided lines of sight and prices comparable to

those of non-disabled fans, and the ADAAG Manual states the exception is not an exception to comparable pricing requirement. According to an old saying, baseball is as American as Mom and apple pie. In a newly constructed public assembly area, a facility constructed specifically to enjoy that all-American activity, such as Coors Field, should be required to provide access to all Americans, disabled and non-disabled, and may not discriminate on the basis of disability in the full and equal enjoyment of Coors Field and the home team, the Colorado Rockies.

In the absence of evidence such as that likely to be presented at trial, this Court is reluctant to conclude at the motion stage of these proceedings that the Rockies have indeed provided their disabled fans with a viewing experience comparable to those of ambulatory patrons and fans of the home team. To the contrary, it appears the Rockies have not provided disabled fans with a comparable experience at Coors Field as that of non-disabled fans, although the Court declines to reach such a conclusion as a matter of law at this stage of the proceedings.

The Court discerns little that indicates the clustering exception to Standard 4.33.3 is intended to have more than limited application to discrete parts of this particular public assembly area, such as balconies, bleachers and the like. There are few cases specifically addressing the exception to Standard 4.33.3. The court in *Berry v. Lowell*, 2003 WL 22050772 (D.Mass.2003), did consider the exception in a 4,700 seat ballpark in which all wheelchair spaces were located in the last row of the ballpark. "Although only six stadium sections are in the outfield, 58 percent of the wheelchair spaces are located there. The premium box area and the sections behind home plate have no handicapped accessible seating." *Id.*, at *1. The opinion provides:

First, plaintiffs contend that defendants have violated by ADA by designing and constructing a stadium in which all wheelchair spaces are located in the last row, with a disproportionate number in the outfield and none behind home plate and in the premium box section. The ADA Accessibility Guidelines ("ADAAG"), promulgated by the United States Department of Justice pursuant to 42 U.S.C. § 12186(b), have set the standard for ADA-compliant seating configurations at stadiums as follows: "Wheelchair areas shall be an integral part of any fixed seating plan and shall be provided so as to provide people with physical disabilities a choice of admission prices and lines of sight comparable to those for members of the general public." 28 C.F.R. Part 36, App. A., § 4.33.3. The exception to the general rule is that "[a]ccessible viewing positions may be clustered for bleachers, balconies, and other areas having sight lines that require slopes of greater than 5 percent. Equivalent accessible viewing positions may be located on levels having accessible egress." *Id.* the Department of Justice has further elucidated the standard in a technical assistance bulletin: "Accessible seating must be an integral part of the seating plan so that people using wheelchairs are not isolated from other spectators or their friends or family." Department of Justice, *Accessible Stadiums* 1 (1996). Additionally, "[w]heelchair seating must be provided in all areas including sky boxes and specialty areas .... [and] must be dispersed throughout all seating areas and provide a choice of admission prices and views comparable to those for the general public." *Id.* A comparable line of sight "allows a person using a wheelchair to see the playing surface between the heads and over the shoulders of the persons standing in the row immediately

in front and over the heads of the persons standing two rows in front." *Id.* at *2.

The case law interpreting and applying the ADAAG provides a measure of support for plaintiffs. In *Paralyzed Veterans of America v. Ellerbe Becket Architects & Engineers, P.C.*, 950 F.Supp. 393 (D.D.C.1996), the builders of a basketball and hockey arena failed to comply with the ADA by "ghettoiz[ing]" many of the wheelchair spaces in the "end zone" areas. "Dispersal requires a choice of various seating areas, good and bad, expensive and inexpensive, which generally matches those of ambulatory spectators." *Id.* at 404. The District of Oregon required horizontal and vertical dispersal of wheelchair seats at a large indoor arena because otherwise "an arena operator could simply designate a few token wheelchair seats in the better seating areas, and cluster the majority of wheelchair seats in the last row or in other undesirable locations. That is contrary to the Congressional intent in enacting Title III of the ADA." *Independent Living Resources v. Oregon Arena Corp.*, 982 F.Supp. 698, 709 (D.Or.1997). In holding that the wheelchair seats could not be clustered in the arena's "end zone" sections, the court noted that the Department of Justice had consistently interpreted Standard 4.33.3 "to require vertical and horizontal dispersal." *Id.* at 708. In one letter, the Department advised:

> In order to fulfill the requirement that comparable lines of sight and admission prices be provided in new construction, wheelchair seating locations ... must be provided in a number equal to approximately one percent of the seats in each price range, level of amenities, and viewing angle. Thus, if there are 400 box seats located between first and third base, there

should be approximately 4 wheelchair seating locations provided within the boxed seating areas located between first and third base.

*Id.* at 708–09 n. 9 (quoting a November 21, 1994, letter from DOJ regarding Yakima County Stadium).

Defendants, on the other hand, argue that the dispersal requirement has been met because wheelchair spaces have been placed "in intermittent locations all the way around the Stadium." They point to the exception to Standard 4.33.3 that allows the clustering of handicapped seating "for areas having sight lines that require slopes of greater than 5 percent." They further note that the original stadium designs had only two ticket categories and that the Lowell Spinners designated certain seats as "premium box" only after the design and construction process was complete. [footnote omitted]

None of these arguments, however, defeats plaintiffs' contentions. The disproportionate number of seats in the outfield raises troubling issues regarding the ADA's dispersal requirements. The deposition testimony by a senior project manager for defendant HOK that the stadium could still be modified to give wheelchairs "accessible egress" to the front-row premium areas suggests that the 4.33.3 exception does not save defendants. Finally, regardless of who created the premium box section and when, the fact that these seats have been designated as especially desirable presents the strong possibility that disabled fans are being forced to watch their beloved Spinners from suboptimal locations.

Nevertheless, the flaws in defendants' arguments do not compel a ruling in plaintiffs' favor. At root, the key determination is whether plaintiffs are being

"discriminated against on the basis of disability in the full and equal enjoyment of" LeLacheur Park. 42 U.S.C. § 12182(a). Compared to the arenas in the cases cited by plaintiffs, the Spinners' stadium is tiny. While any right-thinking Portland Trailblazer or Washington Wizard fan would prefer to watch from center court as opposed to the "end zone" seats at their respective arenas, it is unclear whether the view varies much from section to section at a relatively intimate 5,000–seat stadium. [footnote omitted]. The issue of whether people in wheelchairs are truly deprived of a viewing experience comparable to that of ambulatory stadium-goers remains a disputed issue of fact. [footnote omitted]. Summary judgment, therefore, is inappropriate.

*Berry v. City of Lowell,* 2003 WL 22050772, \*2–\*3 (footnotes omitted).

This Court agrees with the analysis employed by the *Berry v. City of Lowell* court. The Rockies may not "ghettoize" wheelchair spaces or designate a few token wheelchair spaces in the luxury seating areas as has been done. " 'Dispersal requires a choice of various seating areas, good and bad, expensive and inexpensive, which generally matches those of ambulatory spectators.' " *Berry v. City of Lowell,* 2003 WL 22050772 (D.Mass.2003), quoting *Paralyzed Veterans of America v. Ellerbe Becket Architects & Engineers, P.C.,* 950 F.Supp. 393 (D.D.C.1996). See also *Fiedler v. American Multi–Cinema, Inc.,* 871 F.Supp. 35, 38–39 (D.D.C.1994) (discussing exception to Standard 4.33.3 and stating "the exception to ADAAG Section 4.33.3 affords AMC no warrant to consign its wheelchair patrons to the back of the Avenue Grand Theater.").

Accordingly, for the foregoing reasons, the Court finds that the defendant's Motion for Partial Summary Judgment must be denied. There are genuine issues of material fact that preclude entry of summary judgment in favor of either party at the present time. It is therefore

**ORDERED** that the defendant's Motion for Partial Summary Judgment shall be, and is, **DENIED.**