Marc FIEDLER, Plaintiff,

v.

AMERICAN MULTI–CINEMA,
INC., Defendant.

Civ. A. No. 92–486 (TPJ).

United States District Court,
District of Columbia.

Dec. 16, 1994.

Joseph Hayes Koonz, Jr. and Victor Earl
Long, Koonz, McKenney, Johnson & Regan,
P.C., Washington, DC, for plaintiff.

Norman Gary Knopf, Knopf & Brown,
Washington, DC, for defendant.

Christopher J. Kuczynski, U.S. Dept. of
Justice, Civ. Rights Div.–Public Access Sect,
Washington, DC, for the U.S.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

Plaintiff Marc Fiedler is a quadriplegic movie-goer in Washington, D.C., who uses a wheelchair to ambulate.[1] Defendant American Multi–Cinema, Inc. ("AMC") is a nation-wide operator of movie theaters, one of which is the Avenue Grand, located on the basement concourse of Union Station, the principal passenger railway terminal in Washington, D.C.[2] The only wheelchair seating available to Mr. Fiedler when he attends the Avenue Grand Theater is one of two wheelchair sites situated at the very back of the theater, in the last row of conventional seats farthest from the screen.

Union Station is owned by the United States and managed by the Department of Transportation, ("DOT"), an agency in the executive branch of the federal government. The Avenue Grand premises (and its sister theaters) are leased to AMC by DOT. Both the construction of the Avenue Grand Theater and the lease thereof to AMC antedate the enactment and the effective date of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12181 et seq., which provides in pertinent part,

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

Title III of the ADA, 42 U.S.C. § 12182(a); 28 C.F.R. § 36.201(a).

Plaintiff Fiedler brings this three-count complaint against AMC alleging, in the first count, that AMC's placement of wheelchair seating in the Avenue Grand Theater violates the ADA. By relegating him to inferior seating in the back of the theater when he goes to see a movie at the Avenue Grand, Fiedler alleges that AMC deprives him of full and equal enjoyment of the facilities to which he, as a disabled person, is entitled under the ADA. As the ADA authorizes a private victim of discrimination to do, he prays for an injunction directing AMC to so reconfigure the seating in the Avenue Grand as to enable him to occupy a wheelchair seat situated in the fourth or fifth rows of the theater.[3]

In the second count of his complaint, Fiedler asks for similar injunctive relief under the District of Columbia Human Rights Act, D.C. Code § 1–2501 et seq., with respect to the Avenue Grand's eight smaller sister theaters, each of which has a seating capacity below the ADA's threshold of 300 seats. In the third and final count of his complaint, Fiedler asks for an award of compensatory damages from AMC for the common law tort of failing to furnish facilities to a member of the public without discrimination. See Restatement (Second) of Torts § 866.

AMC has moved for summary judgment on the entire complaint, pursuant to Fed. R.Civ.P. 56, on several grounds. Fiedler, joined by the United States as amicus curiae, opposes the motion. AMC contends that the ADA is inapplicable to its Union Station premises by virtue of its status as a lessee of an entity itself not subject to the provisions of the ADA, namely, the executive branch of the federal government. Second, AMC argues that even if it must comply with the ADA generally, dispersed seating for wheelchair-bound patrons is not required at the Avenue Grand because the theater actually conforms to a technical exception the United States Department of Justice has written into its implementing literature for the ADA, allowing the "clustering" of seating for the disabled in certain circumstances.[4] Lastly,

---

1. Although a quadriplegic, Fiedler has some use of his upper body, arms, and hands. His wheelchair is manually powered.

2. The Avenue Grand is the largest of nine movie theaters that AMC operates as a single complex at Union Station.

3. See 42 U.S.C. §§ 12182(b)(2)(A)(iv); 12188(a)(2) and 12188(b)(2)(A).

4. The United States Department of Justice is charged by statute with the implementation of Title III of the ADA, 42 U.S.C. § 12186(b), and to that end it has promulgated conventional regulations and published literature interpreting the regulations, including a "technical assistance" manual, pursuant to 42 U.S.C. § 12206(c)(3), entitled The Americans with Disabilities Act Title III Technical Assistance Manual Covering Public Accommodations and Commercial Facilities (the

AMC asserts that the ADA does not require equivalent treatment of the disabled and the able-bodied when to do so would present a "direct threat" to the health or safety of others.

The Court concludes that two of AMC's defenses to Fiedler's claim under the ADA are without merit as a matter of law, and the third presents disputed issues of material fact. Therefore, for the reasons set forth below, the Court will deny AMC's motion for summary judgment with respect to Count One, deferring consideration of the remaining claims until trial.

## I.

■ AMC contends that Title III of the ADA is inapplicable to it because it leases the space for its theaters from an agency in the executive branch of the federal government. The parties agree that the executive branch is exempt from the requirements of Title III of the ADA, and that insofar as government buildings are concerned, executive branch real estate is subject to another federal anti-discrimination regime, namely, the Architectural Barriers Act ("ABA") of 1968, 42 U.S.C. § 4151 *et seq.*[5] AMC argues that since Union Station is a federal building, it is covered only by the ABA, and AMC, as lessee of a federal landlord, can therefore claim the benefit of Union Station's ADA-exempt status

for the purpose of avoiding the requirements of the ADA.

By its terms, however, Title III of the ADA applies to a "place of public accommodation," which in turn is defined as "a facility, operated by a private entity, whose operations affect commerce and fall within at least one of the following categories ... (3) A motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment." 28 C.F.R. § 36.104; *see also* 42 U.S.C. § 12181(7)(C). The Avenue Grand Theater is indisputably a "motion picture house." It is "operated by a private entity," the defendant AMC. And by regulation it has been declared to "affect commerce."[6] Thus, the Court concludes that the Avenue Grand Theater is a "place of public accommodation" and, as such, is subject to Title III of the ADA.

■ Moreover, the ADA itself expressly contemplates that entities to which it applies might be subject to two or more separate sets of obligations with respect to their treatment of handicapped patrons. *See* 42 U.S.C. § 12201(b) ("Nothing in this chapter shall be construed to invalidate or limit the remedies, rights and procedures of any Federal law ... that provides greater or equal protection for the rights of individuals with disabilities than are afforded by this chapter.").[7] AMC main-

---

"Title III Manual"), and "accessibility guidelines," entitled Americans with Disabilities Act Accessibility Guidelines ("ADAAG"), 28 C.F.R. Pt. 36, App. A at 4.33.3.

Although the parties do not agree as to the force and effect each is to be given, the Court will deem them as regulations and interpretations of regulations, the latter to be given controlling weight as to the meaning of the former. *See Thomas Jefferson Univ. v. Shalala,* —— U.S. ——, ——, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994).

**5.** The ABA generally applies to buildings and facilities that are constructed or altered on behalf of the government; leased by the government; financed by certain government grants or loans; or constructed under authority vested by certain statutes. *See* 42 U.S.C. § 4151–52.

**6.** *See* Title III Manual § III–1.2000.A (Supp. 1994) (a facility that is "open to out-of-state visitors," as Union Station and all of its amenities, including the Avenue Grand Theater, are, "affects commerce").

The Department of Justice also directly addresses the status of private lessees of government property in its Title III Manual:

*If the owner of a building is not covered by the ADA, is it possible for a private tenant to still have title III responsibility?* Yes. The fact that a landlord in a particular case is not covered by the ADA does not necessarily negate title III's coverage of private entities that lease or operate places of public accommodation within the facility.

ILLUSTRATION: A Federal Executive agency owns a building in which several spaces are rented to retail stores. Although Federal executive agencies are not covered by the ADA, the private entities that rent and operate the retail stores, which are places of public accommodation, are covered by title III.

Title III Manual § III–1.2000.B (Supp.1994).

**7.** *See also* Title III Manual § III.1.8200 at 8 ("Title III does not disturb other Federal laws ... that provides (sic) protection for individuals with disabilities at a level greater or equal to that provided by the ADA.").

tains that the provisions of the ABA and the ADA may potentially conflict with one another, but it has made no showing here that its compliance with the ADA in this case would be inconsistent with any obligation it may also have inherited under the ABA as the lessee of a federal landlord. Accordingly, the Court finds that the ADA is applicable to AMC notwithstanding the federal government's fee simple ownership of the leased property.

## II.

■ Having determined that the ADA is applicable, the Court must next consider whether AMC has complied with its requirements for retrofitting existing structures to accommodate the disabled. The requirements are found in the regulations promulgated by the Department of Justice, pursuant to 42 U.S.C. § 12186(b), which, as they pertain to this case, provide as follows:

To the extent that it is readily achievable, a public accommodation in assembly areas shall—

(i) Provide a reasonable number of wheelchair seating spaces and seats with removable aisle-side arm rests; and

(ii) Locate the wheelchair seating spaces so that they—

(A) Are dispersed throughout the seating area;

(B) Provide lines of sight and choice of admission prices comparable to those for members of the general public;

(C) Adjoin an accessible route that also serves as a means of egress in case of emergency; and

(D) Permit individuals who use wheelchairs to sit with family members or other companions.

28 C.F.R. § 36.308(a)(1).

AMC acknowledges that dispersion of wheelchair seating throughout the Avenue Grand is "readily achievable." It is exempted from any obligation to do so, however, it says, by an "exception" found in an explanatory portion of the technical regulations allowing it to "cluster" wheelchair seating at a single location (presumably of its choice) in "bleachers, balconies, and other areas *having*

*sight lines that require slopes of greater than 5 percent.*" ADAAG, 28 C.F.R. Pt. 36, App. A at 4.33.3 (emphasis added). The defendant argues that the underlined portion of Section 4.33.3 should be interpreted to mean that if the "slope," or grade, *of the aisle* in a theater or other place of public exhibition exceeds five percent, then it is not required to disperse wheelchair seating throughout the theater. Specifically, when the grade of the floor exceeds a one-inch rise in twenty inches of horizontal travel—an arguably more difficult ascent for a person in a wheelchair—as is the grade on all of the aisle areas of the Avenue Grand except at the rear, then the theater operator is entitled to "cluster" its wheelchair seating, ostensibly where it concludes it is safest for its wheelchair patrons, but in practical effect wherever it chooses.

Fiedler and the government maintain that the "exception" has nothing to do with the slope of floors or aisles; the exception speaks to the angle of vision between spectator and spectacle, or, more precisely, the angular distance a spectator must drop or raise his line of sight below or above the horizontal to observe what he came to see.

The mandatory portion of the regulation to which the "exception" relates, provides:

Wheelchair areas shall be an integral part of any fixed seating plan and shall be provided so as to provide people with physical disabilities a choice of admission prices and *lines of sight* comparable to those for members of the general public. ·

ADAAG, 28 C.F.R. Pt. 36, App. A at 4.33.3 (emphasis added). In context, therefore, both the mandate and the exception appear to concern, as Fiedler contends, a criterion of visual vantage, not physical safety. In other words, disabled people are to have equal access to the less desirable (and presumably cheaper) seats at theatrical events, as well as the most coveted.

The government, agreeing with Fiedler's interpretation of Section 4.33.3, asserts that the clustering exception is intended to have very limited application to discrete parts of assembly areas, such as balconies, bleachers, and the like. These seating areas are unique, it says, in that they are almost al-

ways situated high above the spectacle to be observed (*i.e.*, where the sight lines almost always exceed five percent). To the extent safety is implicated at all in the reason for the exception, it is because access to these seats is almost always afforded by steps, not ramps. Thus, wheelchair seating can only be provided at the top or bottom of those areas. This narrow exception is inapplicable, according to the government, to a typical single-level movie theater, where steep lines of sight are not generally found.

As the author of the regulation, the Department of Justice is also the principal arbiter as to its meaning. *See Thomas Jefferson Univ. v. Shalala, supra,* n. 4. The Court concludes that the exception to ADAAG Section 4.33.3 affords AMC no warrant to consign its wheelchair patrons to the back of the Avenue Grand Theater.

### III.

■ AMC's most persuasive argument in support of a right to retain its wheelchair seating in the back of the Avenue Grand despite the ADA is that the presence of a wheelchair and its occupant in the midst of able-bodied patrons in fear for their own safety could impede a mass exodus of the theater in the case of an emergency. It would thus constitute a "direct threat to the health or safety of others," in which case compliance with the ADA is no longer obligatory. *See* 42 U.S.C. § 12182(b)(3); 28 C.F.R. § 36.208(a). A "direct threat" is defined as "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services." 42 U.S.C. § 12182(b)(3); 28 C.F.R. § 36.208(b). "In determining whether an individual poses a direct threat to the health or safety of others," thus justifying disparate treatment of the disabled in the interest of public health or safety, "a public accommodation must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable mod-

ifications of policies, practices, or procedures will mitigate the risk." 28 C.F.R. § 36.208(c).

Fiedler cites to several cases recently decided under the ADA that have held that the right to treat a disabled person disparately, and less favorably, on the ground that to do otherwise would endanger others must be preceded by an individualized assessment of the nature and extent of danger in relation to the specific disability of the person to be disfavored. *See, e.g., Bombrys v. Toledo,* 849 F.Supp. 1210 (N.D.Ohio 1993) (enjoining defendant from implementing blanket exclusion for persons with insulin-dependent diabetes from employment as police officers); *Anderson v. Little League Baseball, Inc.,* 794 F.Supp. 342 (D.Ariz.1992) (enjoining defendant from implementing a policy banning coaches in wheelchairs from the coaches' boxes along the baselines, where an individualized assessment revealed that plaintiff had successfully served as either a first base or third base coach for three years without incident); *see also Doe v. District of Columbia,* 796 F.Supp. 559 (D.D.C.1992) (enjoining defendant from disqualifying HIV positive firefighter because of purported "direct threat" under Rehabilitation Act).

Making his own individualized assessment in his case, Fiedler dismisses the threat to safety he poses as *de minimis.* He has, he says, ample upper body strength to move his own wheelchair rapidly up the aisles at the Avenue Grand. He also never attends a performance in a theater with a steeply sloped aisle unless he is accompanied by a companion who is willing and able to assist him in the event of an emergency. Moreover, he states, he customarily waits for the other patrons to exit before he leaves a movie theater. He observes that the likelihood of a theater fire is so remote—none having occurred in the United States, he says, in more than fifty years—and of a magnitude sufficient to force a general evacuation of the audience, given modern fire safety precautions, is such as to render the risk to others virtually non-existent.

AMC is not so sanguine. By scattering wheelchair seating throughout the audience, unless all of a theater's emergency exits are

equipped with ramps (as those at the Avenue Grand are not), a wheelchair-bound patron can exit only at the rear, which he can reach only by negotiating his way *up the aisle* from a seat toward the screen. In event of an emergency evacuation, he would be proceeding against substantial crowd traffic heading for nearer exits in the opposite direction. Even those patrons moving in the same direction but behind the wheelchair will be able to proceed only at a pace determined by the ability of the occupant of the wheelchair to propel his or her chair upgrade.

A theater fire, moreover, while representing the classic crisis situation, is not the only event that could precipitate the flight of the audience: a bomb threat, a deranged patron with a gun, or a riot could have a similar effect.

Finally, the cases cited by plaintiff are only marginally apposite. Fiedler's prayer for relief is not concerned with AMC's policies, practices, or procedures, but with its structural amenities. Thus, unlike policies, practices, and procedures—which are more readily adaptable and can be discretely applied in individual cases—structural changes, such as wheelchair seating dispersed throughout a movie theater, once built, would be available not only to Fiedler, but also to other handicapped individuals who may pose a far greater "direct threat" to other patrons than Fiedler.

Therefore, the "individualized assessment" called for in this case will require the taking of evidence to determine not only whether Mr. Fiedler's presence in the fourth or fifth row of the Avenue Grand Theater in his wheelchair poses a significant risk to his fellow theater-goers, but also whether others similarly limited by disability, but less agile or prudent than he, might also do so, and whether AMC can readily achieve an accommodation that might ameliorate the dangers so posed.

For the foregoing reasons, therefore, it is this 16th day of December, 1994,

ORDERED, that the defendant's motion for summary judgment is denied; and it is

FURTHER ORDERED, that the parties will appear before the Court on January 4, 1995 at 9:30 a.m. for a status conference.