PARALYZED VETERANS
OF AMERICA, et al.,
Plaintiffs,

v.

ELLERBE BECKET ARCHITECTS
& ENGINEERS, P.C., et al.,
Defendants.

Civ. No. 96–1354 (TFH).

United States District Court,
District of Columbia.

Dec. 20, 1996.

William H. Jeffress, Jr., Niki Kuckes, David S. Cohen, Mathew S. Nosanchuk, and Jody A. Manier, Miller, Cassidy, Larrocca & Lewin, L.L.P., Washington, DC, for Plaintiffs.

Brendan V. Sullivan, Jr., John G. Kester, Williams & Connolly, Washington, DC, for Defendants.

### *MEMORANDUM OPINION*

THOMAS F. HOGAN, District Judge.

Defendants filed a motion for summary judgment in this case, arguing that the Americans with Disabilities Act does not require a new arena to provide wheelchair seat locations with lines of sight over standing spectators. Defendants further argue that their current design, which provides some, but not all, locations with these "enhanced" sightlines, otherwise complies with the requirements of the Act. The parties submitted voluminous pleadings, and the Court held hearings on this motion. On October 21, 1996, after consideration of the pleadings and oral arguments of the parties, the Court issued an opinion from the bench, denying defendants' motion and finding as a matter of law that the Americans with Disabilities Act does require such enhanced sightlines at sub-

stantially all wheelchair locations in a new arena. The Court issues this written memorandum opinion as an additional explanation of its bench opinion of October 21.

## I

Plaintiffs filed this suit on June 14, 1996, alleging that the wheelchair seating locations designed for the new MCI Center arena, to be constructed in downtown Washington, D.C., violate the Americans with Disabilities Act, 42 U.S.C. 12101 et seq., and the District of Columbia Human Rights Act, D.C.Code § 1-2519.[1] On July 19, 1996, the Court denied plaintiffs' motion for a preliminary injunction. On that date, the Court granted the two Ellerbe Becket defendants' motions to dismiss,[2] leaving D.C. Arena L.P., Washington Sports & Entertainment, Inc., Centre Group, L.P., Abe Pollin Sports, Inc., and Abe Pollin as the remaining defendants in the case.

## II

This case presents the Court with an exercise in statutory interpretation; however, this already complicated task is made even more so by the undulated interplay between agencies under the Act. Title III of the Americans with Disabilities Act of 1990 ("ADA") became effective on January 26, 1992. It provides that, except in certain limited areas, the Attorney General plays the primary role in the enforcement of Title III,[3] 42 U.S.C. § 12188(b), and has the authority to issue regulations to carry out this enforcement.[4] 42 U.S.C. § 12186(b). Congress empowered the Architectural and Transportation Barriers Compliance Board ("the Board") to issue "minimum guidelines" for Titles II and III. 42 U.S.C. § 12204(a). The Board's guidelines do not have any binding effect on their own, but instead help shape the Attorney General's regulations, which must be "consistent" with the Board's guidelines.[5] 42 U.S.C. § 12186(c). As it turned out, the Attorney General's regulations and the Board's guidelines were extremely consistent; indeed, they contained the exact same language. On July 26, 1991—the same day that the Board adopted its guidelines (the ADAAG)—the Attorney General promulgated the Justice Department's Standards for Accessible Design (the JDSAD), codified at 28 C.F.R. Pt. 36, App. A, which constitute the Department's regulations for compliance with Titles II and III of the ADA.

One particular regulation is particularly at issue in this case, JDSAD § 4.33.3. This regulation requires that wheelchair areas "shall be provided so as to provide people with physical disabilities a choice of admission prices and lines of sight comparable to those for members of the general public." 28 C.F.R. Pt. 36, App. A, § 4.33.3. The key question is whether the language "lines of sight comparable to those for members of the general public" requires that wheelchair patrons at sports and concert venues have an "enhanced" line of sight, that is, a view of the performance floor over persons in front of

---

1. In addition to challenging the line of sight provided by wheelchair locations, the plaintiffs may also be challenging the integration and dispersal of wheelchair locations. For purposes of this motion, however, the Court need not determine whether the seating meets these requirements.

2. The Court later dismissed a third defendant, D.C. Arena Associates, Inc., on August 22.

3. Section 308 of the Act also provides a private right of action for "any person who is being subjected to discrimination on the basis of disability in violation of this title or who has reasonable grounds for believing that such person is about to be subjected to discrimination." 42 U.S.C. § 12188(a)(1) (1996). Because the Department of Justice has declined to get involved, the plaintiffs have brought the present action under this section of the Act; defendants did not dispute that plaintiffs had standing to bring it.

4. Excepted from this delegation are those parts of the ADA which are applicable to transportation matters. Enactment of those regulations was delegated to the Department of Transportation.

5. The Board played a similar role in the implementation of the Architectural Barriers Act of 1968. Pursuant to the 1978 amendments to that statute, the Board in 1982 enacted minimum guidelines (the Minimum Guidelines Requirements for Accessible Design), which the four federal agencies charged with enforcing compliance then used to develop the Uniform Federal Accessibility Standards in 1984.

them when those persons rise from their seats to stand. Defendants claim that it does not. They argue that historically this language, which is similar to that contained in the older MGRAD and ANSI standards, has been interpreted within the industry to require only a line of sight over seated spectators. Defendants further argue that the Board has on several occasions declined to read the ADAAG to require enhanced sightlines, and that the Department of Justice has not properly interpreted the JDSAD to require an enhanced line of sight.

### III

Defendants are correct that the Board has declined to address the issue of lines of sight over standing spectators. When considering its proposed guidelines in January of 1991, the Board solicited comments on enhanced sightlines. 56 Fed.Reg. 2,314 (1991). It received several such comments, but when it adopted its guidelines on July 26, 1991, it specifically deferred any decision on the issue to a future report.[6] 56 Fed.Reg. 35,440 (1991). On December 21, 1992, the Board again deferred the issue of enhanced sightlines.[7] 56 Fed.Reg. 60,618 (1992). A Report was finally published in July 1994, and while it discussed enhanced lines of sight in recreational settings, it did not provide a clear recommendation on the subject. See Recreational Access Committee, *Recommendations for Accessibility Guidelines: Recreational Facilities and Outdoor Developed Areas* at 42 (1994). Furthermore, while a proposed draft of the 1996 ADAAG manual suggests that the Board may be ready to interpret "comparable" as requiring enhanced sightlines, it has still not taken that official position.

Whatever the Board's treatment of its ADAAG § 4.33.3, it is clear that the Board is not the authoritative agency on this matter. Under the ADA, the Board is merely given the role of setting minimum guidelines for the Attorney General's regulations to follow. Nowhere is the Board listed as one of the agencies having primary responsibility for either enforcing the Act or for interpreting it; at most it has a supplementary role. See, e.g., 55 Fed.Reg. 50,239 (1990) (Four agencies responsible for implementing the ADA are DOJ, EEOC, DOT, FCC).

Instead, the Justice Department is the authoritative agency, and the JDSAD, not the ADAAG, are the authoritative guidelines. Therefore, it is the interpretation of the Department of Justice—the agency with the authority to enact binding regulations and to enforce the Act—that shapes the meaning of the regulations. The Justice Department adopted the guidelines of the Board as its own regulations, but it may still adopt different interpretations of those regulations, so long as they are "consistent" with the Board's guidelines. See 42 U.S.C. §§ 12186(b), (c).

The Justice Department does not leave an extensive record to document its interpretation of JDSAD § 4.33.3. However, there is some evidence, consisting primarily of correspondence with prospective architects, team owners, and builders of sports stadia, that reveals a developing interpretation of § 4.33.3. This evidence demonstrates that, although at least one Justice Department official had represented in 1992 that the Act did not require enhanced lines of sight, by August 1993, only nineteen months after the Act took effect, Justice Department officials were interpreting § 4.33.3 to require enhanced sightlines in sporting venues and were informing architects to provide these sightlines in order to comply with the ADA. Furthermore, in December 1994, the Civil Rights Division of the Department of Justice issued a supplement to its "Americans with Disabilities Act Title III Technical Assistance Manual" ("TAM"), which required that, "in assembly areas where spectators can be expected to stand during the event or show being viewed, wheelchair locations must provide lines of sight over spectators who

---

6. "The issue of lines of sight over standing spectators will be addressed in guidelines for recreational facilities."

7. "The Board intends to address the issue of lines of sight over standing spectators in the guidelines for recreational facilities which will be proposed at a future date."

stand."[8] This interpretation has since been reiterated in a May 1996 release entitled "Accessible Stadiums" which was distributed in connection to the Atlanta Olympic facilities.

The Court is concerned that the Justice Department is not present in this case to verify or describe this proffered interpretation of JDSAD § 4.33.3. However, it is clear to the Court that the ADA is a remedial statute that changed the law as it then existed; therefore, it is not inappropriate for the Justice Department to assert this position, even though it may be at odds with historical interpretations within the design and construction industry. Furthermore, even though the Justice Department may at first have adhered to the traditional construction of "comparable," it is evident that, at least by August of 1993, Justice had begun to embrace a different meaning. It appears to the Court that this interpretation of § 4.33.3 requires that wheelchair seating be dispersed throughout the stadium or arena and that substantially all wheelchair locations provide an "enhanced" line of sight over standing spectators, if such spectators can be expected to stand during the event.

## IV

The Court feels bound to give deference to the Justice Department's interpretation of its own regulations. The views of the Board or of any other entity are not authoritative. Whether the Justice Department wrote the language of the regulation itself or merely adopted the language from another source, JDSAD § 4.33.3 is its regulation alone, and the Justice Department stands as its principal arbiter.[9]

■ An agency is empowered to interpret its own regulations so long as such interpretation is reasonable in light of the text and purpose of the statute and consistent with the statute and regulation. *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 514–15, 114 S.Ct. 2381, 2388, 129 L.Ed.2d 405 (1994); *Used Equipment Sales v. Dept. of Transportation*, 54 F.3d 862, 865 (D.C.Cir. 1995); *N.Y. State Department of Social Services v. Bowen*, 835 F.2d 360, 361 (D.C.Cir. 1987). If the agency's interpretation meets this standard, then the Court is required to give it "substantial deference." *Thomas Jefferson University*, 512 U.S. at 512, 114 S.Ct. at 2386.

A reasonable arbiter could define JDSAD § 4.33.3's requirement of "comparable" sightlines to mean sightlines over standing spectators. Furthermore, the Justice Department's interpretation of § 4.33.3 and is consistent both with the language of the ADAAG and with the provisions of the ADA itself. Nor does the interpretation add new duties or rights to the statute, such that APA requirements are triggered. See *General Motors v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C.Cir.1984). Therefore, the interpretation outlined by the Justice Department is entitled to deference from this Court.

Defendants' arguments for summary judgment are based on the proposition that their arena design conforms to the ADA because there is no requirement that the wheelchair seating locations provide an enhanced line of sight. Defendants have proceeded up to this point in good faith, believing this to be true. However, the Court finds as a matter of law that, pursuant to the Justice Department's interpretation of its own JDSAD § 4.33.3, which is binding under the ADA, the defendants must construct an arena in which substantially all wheelchair locations have an enhanced line of sight over standing spectators. Defendants have not established beyond dispute that the present arena design meets this standard, as is required under

8. Defendants argued that the Technical Assistance Manual (TAM) cannot have a binding effect because it was an illegal rulemaking under the Administrative Procedure Act. While this contention may or may not have merit, it does not impact this case, because the TAM is only one indication of a general Justice Department interpretation of Standard 4.33.3. The validity of the TAM provisions as authority does not affect the interpretation of Standard 4.33.3, which all parties agree is binding authority.

9. Judge Jackson of this Court has also taken this position, albeit in dicta, in *Fiedler v. American Multi–Cinema*, 871 F.Supp. 35 (D.D.C.1994), stating that the Department of Justice is both the author and principal arbiter of Standard 4.33.3 *Id.* at 39.

Federal Rule of Civil Procedure 56. See *Anderson v. Liberty Lobby,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). Therefore, defendants' motion for summary judgment cannot succeed.

For the above reasons, the Court denied defendants' motion for summary judgment in its bench opinion of October 21, 1996.