**William CARUSO and Advocates for Disabled Americans, Plaintiffs,**

v.

**BLOCKBUSTER–SONY MUSIC ENTERTAINMENT CENTRE, et al., Defendants.**

**Civil Action No. 95–3400 JEI.**

United States District Court, D. New Jersey.

June 25, 1997.

Anthony J. Brady, Jr., Voorhees, NJ, for Plaintiffs.

Blank, Rome, Comisky & McCauley by Jonathan M. Kom, Norman E. Greenspan, Rebecca D. Ward, Cherry Hill, NJ, for Defendants.

## OPINION

IRENAS, District Judge:

This matter appears before the Court on defendants' motion for partial summary judgment. Defendants argue that summary judgment is appropriate on the following issues: (1) whether the Blockbuster–Sony Music Entertainment Centre ("E–Centre") violates the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12201 *et seq.*, and its implementing regulations the Justice Department's Standards for Accessible Design ("JDSAD"), 28 C.F.R. pt. 36 App. A § 4.33.3, by failing to provide unobstructed lines of sight for wheelchair users over spectators standing in front of them; and (2)

whether the lawn area outside the E–Centre pavilion violates the ADA and the JDSAD. Defendants' motion for partial summary judgment is granted as to both issues.[1]

## I. BACKGROUND

Plaintiffs William Caruso ("Caruso")[2] and the Advocates for Disabled Americans[3] filed their complaint on July 14, 1995, alleging that defendants' E–Centre facility[4] does not comply with the public accommodations provisions of the ADA. Construction of the E–Centre began in the spring of 1994 and it opened to the public in May 1995. On July 13, 1995, Caruso attended a concert at the E–Centre. He alleges two specific ADA violations: (1) he could not see the concert from his wheelchair because the E–Centre does not have enhanced lines of sight for the disabled; and (2) the E–Centre's lawn area was not accessible to him. To support the allegations, plaintiffs rely on an expert report, prepared by Paradigm Design Group ("Paradigm").[5] Defendants filed the instant motion for partial summary judgment on April 30, 1997, claiming that several of the claims raised in the Paradigm report should be dismissed.

## II. DISCUSSION

### A. Standard for Summary Judgment

Under Fed.R.Civ.P. 56(c), a court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The non-moving party may not simply rest on its pleadings to oppose a summary judgment motion but must affirmatively come forward with admissible evidence establishing a genuine issue of fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *See Pollock v. American Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986). The role of the court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

The substantive law governing the dispute will determine which facts are material, and only disputes over those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. A genuine issue for trial does not exist "unless the party opposing the motion can adduce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank,* 813 F.2d 610, 618 (3d Cir.1987) (Becker, J., concurring).

### B. Enhanced Lines of Sight

Plaintiffs allege that the E–Centre fails to comply with 28 C.F.R. pt. 36 App. A

1. After the disposition of this motion, several claims remain. Plaintiffs allege that defendants are not in compliance with the JDSAD for the following reasons: (1) lack of accessible routes to some concession facilities; (2) lack of "fixed" companion seating; (3) railings and signages are "protruding objects"; (4) some entrance doors are too narrow; (5) lack of an "alternate" stall in the restrooms; (6) picnic benches are not wheelchair-accessible; (7) ticket and concession stand counters are too high for wheelchair users; (8) employee facilities do not meet minimum standards; and (9) automated teller machines are too high for wheelchair users.

2. Plaintiff Caruso is a disabled veteran of the Vietnam War. As a result of his war-related injuries, plaintiff uses a wheelchair.

3. Advocates for Disabled Americans is a non-profit New Jersey corporation.

4. The E–Centre is a music and entertainment facility located in Camden, New Jersey that can accommodate up to 25,000 spectators.

5. Plaintiffs' complaint broadly alleges that defendants' facility "discriminates against the disabled" in violation of the ADA. Defendants filed a motion for a more definite statement pursuant to Fed.R.Civ.P. 12(e), which this Court denied by Order dated January 8, 1996. We glean the specifics of plaintiffs' allegations from the Paradigm report.

§ 4.33.3, an ADA regulation that provides as follows: "Wheelchair areas shall be an integral part of any fixed seating plan and shall be *provided so as to provide people with physical disabilities a choice of admission prices and lines of sight comparable to those for members of the general public.*" Plaintiffs allege that the phrase "comparable" lines of sight mandates that wheelchair users be given "enhanced" lines of sight, which would enable them to see over the heads of standing spectators.[6]

To support this interpretation of § 4.33.3, plaintiffs rely on the 1994 Supplement to a 1993 Department of Justice ("DOJ") Technical Assistance Manual ("TAM"). *See* Def. Ex. 2 at 3. The 1994 TAM Supplement provides as follows:

In addition to requiring companion seating and dispersion of wheelchair locations,

ADAAG requires that wheelchair locations provide people with disabilities lines of sight comparable to those for members of the general public. Thus, in assembly areas where spectators can be expected to stand during the event or show being viewed, *the wheelchair locations must provide lines of sight over spectators who stand.*

Department of Justice, Americans with Disabilities Act Technical Assistance Manual,

1993 & Supp.1994, 111–7.5180 (emphasis added).

Defendants contend that the plain language of § 4.33.3 does not require enhanced lines of sight and that the DOJ TAM provision is inapplicable because DOJ failed to follow appropriate administrative procedures. Moreover, defendants argue that even if DOJ had adhered to the proper procedures, the provision would still be inapplicable because it was issued after construction of the E–Centre began.

### 1. Legislative History

Congress enacted the ADA in 1990. *See* Pub.L. No. 101–336, 104 Stat. 369 (1990). In the ADA, Congress mandated that the United States Architectural and Transportation Barriers Compliance Board ("Access Board")[7] issue minimum guidelines[8] to implement Title III of the ADA, which covers access to public accommodations.[9] *See* 42 U.S.C. § 12204. Certain federal agencies, including the DOJ, must then issue regulations consistent with the Access Board's minimum guidelines. *See* 42 U.S.C. § 12186(b), (c). The ADA provided for interim accessibility standards that governed until the DOJ passed its final regulations. *See* 42 U.S.C. § 12186.

In accordance with the ADA, the Access Board issued the Americans with Disabilities Act Accessibility Guidelines ("ADAAG").

---

**6.** Defendants claim that some areas of the E–Centre do provide wheelchair users with enhanced lines of sight. Defendants assert that Sections 200 and 204 (which contain 66 wheelchair spaces, in excess of the 62 required for the facility) are 34 inches above the promenade and provide a nearly seven-foot-high unobstructed line of sight over the head of a passing person, assuming users with a 48–inch eye level. *See* Def. Ex. C, Aff. of James A. DiLuigi at ¶ 21–23. Also, those seats provide a more than five-and-a-half-foot-high line of sight over the heads of standing spectators. Plaintiffs neither challenge these measurements nor offer an alternative arrangement that would be satisfactory. In addition, 54 wheelchair spaces in the orchestra provide unobstructed lines of sight. *See id.* ¶ 24. However, these spaces might be closed during some performances for security reasons. *See id.* Because defendants do not contend that all of the wheelchair seats provide enhanced lines of sight, and because plaintiff alleges that he did not have an unobstructed view when he visited the E–Centre, we address the relevant legal issues.

**7.** Originally, Congress created the Access Board to insure compliance with the Architectural Barriers Act of 1968, 42 U.S.C. § 4151, which governed accessibility to federally funded buildings. *See* 29 U.S.C. § 792. In 1992, Congress amended 29 U.S.C. § 792 to include an additional function for the Access Board——develop advisory guidelines for Titles II and III of the ADA. *See* 29 U.S.C. § 792(b)(2).

**8.** The minimum guidelines supplemented the existing Minimum Guidelines and Requirements for Accessible Design ("MGRAD"), 36 C.F.R. pt. 1190.

**9.** Title III of the ADA provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182.

*See* 56 Fed.Reg. 35,408 (1991) (codified at 36 C.F.R. pt. 1191 App. A). The Access Board promulgated its guidelines in accordance with the notice-and-comment procedures required by the Administrative Procedure Act ("APA"). 5 U.S.C. § 553. That same day, the Department of Justice adopted the ADAAG as its own regulations, entitled the Justice Department's Standards for Accessible Design ("JDSAD"). *See* 56 Fed.Reg. 35,544, 35,586 (1991) (codified at 28 C.F.R. pt. 36 App. A).

The parties present three sources of authority for determining whether the E–Centre must have enhanced lines of sight. First, there is the statute itself, which does not contain any specific provisions governing sight lines in assembly areas. Second, we have 28 U.S.C. pt. 36 App.A. § 4.33.3, the DOJ's properly promulgated regulation, which as defendants correctly point out, does not expressly contain an enhanced sight line requirement. Finally, we have a DOJ TAM provision that does include such a requirement.

### 2. *DOJ TAM Provision*

■ First, we address to what degree, if any, the defendants are bound by the supplemental DOJ TAM provision. In issuing this provision, DOJ did not follow APA rulemaking procedures. Defendants claim that the TAM provision is an agency rule that should have been subject to APA requirements. Defendants argue, therefore, that DOJ's failure to follow the APA renders the TAM provision inapplicable to the E–Centre.

A "rule" is defined by the APA as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). An agency must publish notice of a proposed rule in the Federal Register. See 5 U.S.C. § 553(b). After notice is given, the agency must provide interested persons with an opportunity to comment on the proposed rule. *See id.* § 553(c). APA notice-and-comment requirements are applicable only to "legislative" or "substantive" rules; they do not apply to "interpretive" rules. *See id.* § 553(b); *Lincoln v. Vigil,* 508 U.S. 182, 196, 113 S.Ct. 2024, 2033–34, 124 L.Ed.2d 101 (1993).

■ An interpretive rule is a provision issued by an agency "to advise the public of the agency's construction of the statutes and rules which it administers." *See Shalala v. Guernsey Mem'l Hosp.,* 514 U.S. 87, 99, 115 S.Ct. 1232, 1239, 131 L.Ed.2d 106 (1995). However, once an agency adopts a position that effects a substantive change from existing regulations, the agency must adhere to APA rulemaking procedures. *See id.* Thus, interpretive rules "must *explain* existing law and not *contradict* what the regulations require." *See id.* at 111, 115 S.Ct. at 1244 (O'Connor, J., dissenting) (emphasis in original); *Bailey v. Sullivan,* 885 F.2d 52, 62 (3d Cir.1989) ("If the rule in question merely clarifies or explains existing law or regulations, it will be deemed interpretive.").

Therefore, if the provision of the TAM qualified as an interpretive rule, DOJ would be exempt from the notice-and-comment requirements. We find that this is not the case.[10] The DOJ TAM provision is akin to a

---

10. Even if the DOJ TAM provision regarding § 4.33.3 were to be classified as an interpretive rule, the interpretation would not be binding on this Court. *See Soileau v. Guilford of Maine, Inc.,* 105 F.3d 12, 15 n. 2 (1st Cir.1997) ("While this court has found reference to the EEOC Compliance Manual helpful on occasion … the manual is hardly binding.") (citations omitted); *Le v. Applied Biosystems,* 886 F.Supp. 717, 720 n. 2 (N.D.Cal.1995); *Schmidt v. Safeway,* 864 F.Supp. 991, 1001 (D.Or.1994) ("The TAM is not the law, nor does it have the force of law. Rather the TAM is merely an attempt to simplify and summarize the applicable law.").

Plaintiffs rely heavily on *Paralyzed Veterans of Am. v. Ellerbe Becket Architects & Engineers, P.C.,* 950 F.Supp. 389 (D.D.C.1996) to support their arguments. In *Paralyzed Veterans,* Judge Thomas F. Hogan ruled that a Washington, D.C. arena had to provide wheelchair users with lines of sight over standing spectators. See *id.* at 389. We find this case distinguishable for two reasons. First, Judge Hogan noted that the defendants had notice of the DOJ TAM provision before planning began. Here, defendants did not have such notice. Second, in *Paralyzed Veterans,* the defendants' building was in the design stage, thereby rendering accommodations much less costly than for the E–Centre, which has already been built. In addition, we disagree with Judge Hogan's assumption that the DOJ TAM provision was an interpretive rule that deserved much deference. We find that the DOJ TAM provision does not

legislative rule. Therefore, in the absence of proper notice-and-comment procedures, the TAM provision is not binding upon the defendants. Moreover, even if the rule had been validly promulgated, the record reflects that E–Centre construction began before DOJ issued the rule.

Congress gave the Access Board the authority to set minimum guidelines for compliance with the public accommodations provisions of the ADA. The Access Board specifically requested comment on the question of requiring enhanced lines of sight[11] and chose to defer the issue.[12] Moreover, the Access Board announced its intention to cover the issue of enhanced lines of sight in a distinct, future regulation.[13] If the Access Board did not intend for § 4.33.3 to cover the issue, a DOJ TAM provision cannot be an interpretation of that regulation. On the contrary, the DOJ

provision is a new substantive rule. It creates a new set of obligations for the defendants that did not exist prior to late 1994. We find that it is inappropriate to hold defendants to a new standard that did not undergo proper administrative rulemaking procedures.[14]

We recognize that the Attorney General has the primary responsibility for enforcing the ADA. Nevertheless, because of the particular administrative scheme constructed by Congress for the ADA, we find it inappropriate to bind the defendants by the DOJ TAM provision. Congress used very broad language in the public accommodations provision in the ADA. *See* 42 U.S.C. § 12182. Accordingly, Congress necessarily contemplated the passage of a detailed regulatory scheme. Construction of large facilities is a complex undertaking involving innumerable choices among a host of variables. Congress

qualify as an interpretive rule. Rather, it is an improperly promulgated substantive rule that conflicts with existing regulations and deserves little deference.

**11.** The legislative history of the Access Board is in relevant part as follows:

Section 4.33.3 provides that seating locations for people who use wheelchairs shall be dispersed throughout the seating area and shall be located to provide lines of sight comparable to those for all viewing areas. This requirement appears to be adequate for theaters and concert halls, but may not suffice in sports areas or race tracks where the audience frequently stands through a large portion of the game or event ... The Board seeks comments on whether full lines of sight over standing spectators in sports arenas and other similar assembly areas should be required.

*See* 56 Fed.Reg. 2296, 2213–14 (1991) (Notice of Proposed Rulemaking).

**12.** *See* 56 Fed.Reg. 35,408, 35,440 (1991) ("Many commenters ... recommended that lines of sight should be provided over standing spectators ... The issue of lines of sight over standing spectators will be addressed in guidelines for recreational facilities.").

**13.** *See* 57 Fed.Reg. 60,612, 60,618 (1992) (Notice of Proposed Rulemaking) (announcing that the Access Board would conduct further research and "address the issue of lines of sight over standing spectators in the guidelines for recreational facilities" and seeking comments on "design issues associated with providing ... a clear line of sight over standing spectators in arenas, stadiums or other sports facilities"); see also 59 Fed.Reg. 31,676, 31,679 (1994) (Interim Final

Rule) (referring to the Access Board's "research project on assembly area accessibility" and reiterating intention "to address issues associated with assembly areas in a separate rulemaking once this research is completed").

**14.** We do not hold, however, that it would have been impermissible for the DOJ to pass a regulation—pursuant to the APA—that provided for enhanced lines of sight for disabled persons in places of public accommodation. Such a finding would have required us to determine whether such a regulation would be a reasonable interpretation of the relevant statutory provision (42 U.S.C. § 12182), see *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and whether the regulation conformed to Congress' mandate requiring the DOJ to adopt regulations "consistent" with the Access Board's minimum guidelines, *see* 42 U.S.C. § 12186(c). Moreover, we render no opinion as to whether the DOJ TAM provision could be characterized as a reasonable interpretation of the "comparable" lines of sight language in § 4.33.3 had there been no legislative history detailing the Access Board's intent to delay the enhanced lines of sight issue for inclusion in a future rule. Usually, courts give a broad scope of deference to an agency's interpretation of its own regulations, see *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994), asking only whether the interpretation contradicts existing regulations, *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). However, because we find that the DOJ TAM provision is not an interpretation of § 4.33.3, we need not reach that inquiry here.

specifically legislated that the Access Board pass the detailed guidelines needed for the ADA's implementation. In this context, it is inappropriate for the DOJ to choose to adopt word-for-word the Access Board guidelines—guidelines which were subject to notice-and-comment and then decide several years later to add new obligations that were specifically omitted from those guidelines. When the "legislative history" of an administrative regulation evinces an intent not to cover a certain subject matter, the notice-and-comment requirements of the APA cannot be evaded by merely interpreting an existing regulation to cover subject matter consciously omitted from its scope.

Congress has elected to pass a very general statute and leave it to the regulatory process to fill in the necessary details. Constructing a stadium or arena is an expensive, complex affair. If the law is to impose certain requirements to assist those with disabilities and to impose an obligation to make expensive retrofits if that law is violated, it is essential that those requirements be clearly articulated in the regulations. Compliance with ADA rulemaking insures, hopefully at least, that all points of view are heard and that the resulting regulation provides concrete guidance to those embarking on such a project. Because the original § 4.33.3 adopted by the Access Board, and on the same day by DOJ, clearly deferred deciding the enhanced sight line issue, no consideration was given to how this goal might be achieved. As plaintiffs' expert report concedes, the technical specifications for eye level adjustments and standing height have not been established by the DOJ or the Access Board. Thus, not only does the DOJ TAM fail to follow the APA procedures for adopting a regulation, it suffers from a vagueness not cured by interpretive manuals or an enforcement history which would put meat on the bones of the concept of enhanced sight lines.

Finally, we note that the DOJ TAM was adopted in late 1994, after construction of the E–Centre had commenced and significantly after the planning and design work had been completed. Moreover, we have no evidence that the defendants had notice that the DOJ had issued the supplement to its TAM. Therefore, at the time E–Centre construction started nobody would have considered that § 4.33.3 required enhanced sight lines. Quite apart from the failure to follow APA procedures, we would decline to give the DOJ TAM interpretation of § 4.33.3 retroactive application.

The question that remains to answer is-in the absence of a binding regulation or a valid interpretive rule-how to resolve the question of whether the ADA requires enhanced lines of sight for disabled spectators. Plaintiffs ask this court to interpret § 4.33.3 of the JDSAD or the ADA statutory language itself as requiring enhanced sight lines. We will consider each argument in turn.

### 3. Statutory Interpretation

[3] Most statutes are enforceable as written without need for reliance on implementing regulations. See, e.g., Skidmore v. Swift, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944) (Fair Labor Standards Act). The ADA, however, is not such a statute. The statute merely states that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182. In our view, Congress did not intend for defendants to be responsible, in the absence of applicable regulations, for determining whether a design provides "full and equal enjoyment" for the disabled. Congress recognized that compliance with the ADA's public accommodations provisions required a set of formal guidelines or regulations. Congress even provided a default set of standards in the event that the DOJ delayed passage of its regulations. Section 12186(d) of the ADA provides:

"If final regulations have not been issued pursuant to this section, for new construction or alterations for which a valid and appropriate State or local building permit is obtained prior to the issuance of final regulations under this section ... compliance with the Uniform Federal Accessibility Standards in effect at the time the building permit is issued shall suffice to satisfy the requirement that facilities be

readily accessible to and usable by persons with disabilities as required under section 12183 of this title ... except that, if such final regulations have not been issued one year after [the Board] issued the supplemental minimum guidelines required under section 12204(a) of this title, compliance with such supplemental minimum guidelines shall be necessary."

42 U.S.C. § 12186(d).

Clearly, Congress did not intend for the ADA to be enforceable except through the adoption of a detailed regulatory framework. Therefore, in the absence of an applicable regulation, we cannot rely solely on the "full and equal enjoyment" statutory language to hold the defendants liable for building a facility without enhanced sight lines. Considerations of due process and the realities of building large, expensive facilities counsel against the courts making architectural, design or engineering judgments in the guise of statutory interpretation after construction of a project is completed.

#### 4. DOJ Regulation § 4.33.3

■ Alternatively, plaintiffs ask the court to interpret the DOJ regulation itself and to find that "comparable" lines of sight regulation requires defendants to provide seats that enable disabled spectators to see over the heads of standing spectators in front of them. Given the history of the DOJ regulations, we find that such an interpretation of § 4.33.3 is unwarranted.

The "comparable" lines of sight language that appears in § 4.33.3 also appeared in prior accessibility guidelines. *See* Minimum Guidelines and Requirements for Accessible Design ("MGRAD"),[15] 47 Fed.Reg. 33,862 (Aug. 4, 1982) (codified at 36 C.F.R. pt. 1190) (incorporating by reference American National Standards Institute ("ANSI")[16] stan-

dard, ANSI A117.1–1986 § 4.31); Uniform Federal Accessibility Standards ("UFAS"),[17] 49 Fed.Reg. 31,528 (Aug. 7, 1984) (codified at 41 C.F.R. subpt. 101–19.6 App. A) (adopting ANSI A117.1–1980 § 4.33). Defendants state, and plaintiffs do not dispute, that neither MGRAD nor UFAS were ever interpreted to require enhanced lines of sight. Moreover, the Access Board guidelines themselves adopted the same ANSI standards used to draft the UFAS. *See* 56 Fed.Reg. 35,408 (1991) (codified at 36 C.F.R. pt. 1191 App. A) (adopting ANSI A117.1–1980 § 4.33).

Defendants argue, and we agree, that there is nothing in ADA legislative history that suggests that the settled interpretation of "comparable" lines of sight should be replaced with a new interpretation. Specifically, when the DOJ chose to adopt the Access Board guidelines as its own regulations, the DOJ did not express any opinion on whether § 4.33.3 required enhanced lines of sight.

Plaintiffs argue that defendant could have broached this issue with the DOJ to get its views on the subject. Apart from the obvious observation that there is no provision in the statute for a permitting or licensing procedure, a builder should not be required to guess as to what issues the regulator might have views not available in the public record. When defendant set about to design and construct the E–Centre, it was clear from the *public* record that the concept of comparable lines of sight had not been interpreted to include enhanced sight lines either under the MGRAD, the UFAS, or the ADAAG, and that this interpretation had been constant since 1984. There is no rational basis for this court to now interpret the regulation in a more expansive way. Therefore, defendants' motion for summary judgment on this issue is granted.

**15.** The MGRAD were developed to implement section 502(b)(7) of the Rehabilitation Act of 1973, 29 U.S.C. § 792, and were "intended to ensure that certain buildings financed with Federal funds are designed, constructed, or altered so as to be readily accessible to, and usable by, physically handicapped persons." 36 C.F.R. § 1190.1.

**16.** ANSI is a private institution in New York City, not connected with the federal government.

**17.** The UFAS were developed by the General Services Administration, the Department of Housing and Urban Development, the Department of Defense, and the United States Postal Service, pursuant to the Architectural Barriers Act of 1968, 42 U.S.C. §§ 4151–4157. *See* 41 C.F.R. subpt. 101–19.6 App. A § 2.1.

## C. Lawn Seating

In addition to the interior seating at the E–Centre pavilion, the facility has a lawn area which can accommodate approximately 18,000 spectators who either stand or sit on portable chairs or blankets. *See* Aff. DiLuigi ¶ 27. Plaintiffs claim that the lawn area is a public accommodation that must be available to disabled spectators, including wheelchair users. *See* Def. Ex. 2 at 5. Plaintiffs allege that the lawn area should be included in determining whether E–Centre has the requisite percentage of wheelchair spaces.[18] Finally, plaintiffs' Paradigm report asserts that the E–Centre violates Section 4.1.2 of the JDSAD because there is no accessible route to the lawn area.

■ Section 4.1.3(19)(a) of the JDSAD provides the number of required wheelchair locations for "places of assembly with fixed seating." As the capacity of seating in assembly areas gets larger, the number of required wheelchair spots increases. Defendant argues that because the lawn area does not have fixed seating, it should not be included when calculating the capacity of the E–Centre. Moreover, defendants contend that if the lawn area is excluded from the calculation, the E–Centre exceeds the requisite number of wheelchair locations.[19] Plaintiffs admit that the lawn area does not contain fixed seating. *See* Def. Statement ¶ 22, Pl. Response ¶ 22. Therefore, the lawn area is clearly not encompassed by § 4.1.3(19)(a). Accordingly, we find that compliance with the ADA does not require that the viewer capacity of the lawn area be included in computing the number of wheelchair spaces and their placement. Therefore, as to plaintiffs' claims based on a lack of sufficient wheelchair seating on the lawn area and in the facility as a whole, defendants' motion for summary judgment is granted.[20]

■ Plaintiffs also allege that the defendants violate JDSAD § 4.1.2 because there is no accessible route for wheelchair users to the lawn area. Section 4.1.2 requires that "[a]t least one accessible route . . . shall connect accessible buildings, accessible facilities, accessible elements, and accessible spaces that are on the same site." Defendants, relying on JDSAD § 2.2, argue that the lawn area need not be accessible to the disabled because other areas of the facility provide "equivalent facilitation." Section 2.2 allows "[d]epartures from particular technical or scoping requirements . . . by the use of other designs and technologies . . . where the alternative designs and technologies used will provide substantially equivalent or greater access to and usability of the facility." Defendants point out that the lawn area seats are not only the least expensive, but also offer the least desirable views of the performance. The E–Centre provides the disabled with higher quality (i.e., closer) seats in the pavilion for the same price as lawn seats. Plaintiffs do not offer any reasons why the interior seats are not equivalent or superior to lawn seating. In our view, the E–Centre provides equal, if not greater, access to its facility for wheelchair users in the interior than it does for non-wheelchair users on the lawn.[21]

**18.** The E–Centre has a total of 180 wheelchair spaces in ten locations. *See* Aff. DiLuigi ¶ 40.

**19.** Plaintiffs do not dispute defendants' representation that the E–Centre, exclusive of the lawn area, complies with the minimum seating requirements of the ADA. Plaintiffs challenge defendants' inclusion of the 54 orchestra spots, arguing that those seats are often closed. *See* Pl. Br. at 7. Nevertheless, the issue of whether the orchestra seats should be included in the total is irrelevant. Because we hold that the lawn area need not be included in the total capacity calculation, there is no dispute that defendants comply with § 4.1.3(19)(a)'s minimum wheelchair seating requirements.

**20.** The parties briefed the issue of whether the lawn area qualifies as a "public accommoda-

tion." *See* 42 U.S.C. § 12182 ("No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation."). This inquiry is irrelevant. Even if we were to find that the lawn area qualified as a public accommodation under the statute, the regulations governing the requisite number of wheelchair seats apply only to places of assembly with fixed seating. *See* 28 C.F.R. pt. 36 App. A § 4.1.3.

**21.** To support the argument that the lawn area need not be accessible to the disabled, defendants also rely on an exception to § 4.33.3, which provides: "EXCEPTION: Accessible viewing positions may be clustered for bleachers,

## III. CONCLUSION

We hold that § 4.33.3 of the JDSAD does not require enhanced lines of sight for wheelchair users. We also hold that because the lawn area is not a place with fixed seating, it need not be included in the calculation of minimum wheelchair space requirements. Moreover, we find that the lawn area need not be connected to the pavilion via a wheelchair-accessible route and that the requisite seating can be provided within the pavilion. Accordingly, defendants' motion for partial summary judgment as to these claims is hereby granted. An appropriate order will be entered on even date herewith.

### ORDER

This matter having appeared before the Court on defendants' motion for partial summary judgment, the Court having reviewed the submissions of the parties, and having heard oral arguments, for the reasons set forth in an opinion issued on even date herewith,

**IT IS** on this 25th day of June, 1997,

**ORDERED THAT** defendants' motion for partial summary judgment is hereby **GRANTED.**

balconies, and other areas having sight lines that require slopes of greater than 5 percent. Equivalent accessible viewing positions may be located on levels having accessible egress."

Defendants argue that because the lawn area slopes more than five percent, the exception to § 4.33.3 allows clustering of wheelchair seating inside the pavilion. Plaintiffs admit that the lawn area contains slopes in excess of five percent. See Aft. DiLuigi ¶ 44. In fact, in certain places the lawn area slopes between 12 and 15 percent. See Def. Statement ¶ 18; Pl. Response ¶ 18. Nevertheless, we are unconvinced that the exception to § 4.33.3 allows clustering inside the pavilion. The exception is somewhat confusing but we are inclined to read it as allowing clustering of wheelchair seats within a sloped area on the levels that have accessible egress. Accordingly, we do not rely on this provision and rest our holding on the principle of equivalent facilitation.

Plaintiffs assert that the slope of the lawn area does not excuse the E–Centre from making the area accessible. To support this argument, plaintiffs cite to DOJ's comments included in a final ADA rule. See 56 Fed.Reg. 35,544, 35,577 (Jan. 26, 1992). The final rule addressed the limits of the doctrine of structural impracticability, provided for in 28 C.F.R. § 36.401(c). However, defendants do not assert a structural impracticability defense. Defendants do not argue that the E–Centre need not be wheelchair accessible because the terrain is too hilly to do so. Rather, defendants claim that the equivalent facilitation provision and/or the exception to § 4.33.3 permit the E–Centre to cluster wheelchair spaces in the interior of the pavilion.